**UNITED STATES of America, Appellee,**

v.

**Michael PIERVINANZI, Daniel Tichio, John M. Bookhart, Jr., Defendants–Appellants.**

Nos. 1021, 1133, Dockets 92–1473, 92–1474.

United States Court of Appeals, Second Circuit.

Argued June 18, 1993.

Decided May 2, 1994.

Bettina Schein, New York City, for defendant-appellant Piervinanzi.

Louis Freeman, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for defendant-appellant Tichio.

Guy Petrillo, Asst. U.S. Atty. for the S.D. of New York, New York City (Roger S. Hayes, U.S. Atty. for the S.D. of New York, Paul G. Gardephe, Asst. U.S. Atty. for the S.D. of New York, New York City, of counsel), for appellee.

Before: CARDAMONE and MAHONEY, Circuit Judges, and CEDARBAUM, District Judge.[*]

MAHONEY, Circuit Judge:

Michael Piervinanzi and Daniel Tichio [1] appeal from judgments of conviction entered July 31, 1992 in the United States District Court for the Southern District of New York, Peter K. Leisure, *Judge,* after an eleven-day jury trial. The jury found Piervinanzi and Tichio guilty of conspiracy, attempted bank fraud, and attempted money laundering charges arising from a scheme to fraudulently transfer funds overseas from an account at Irving Trust Company ("Irving Trust"). The jury also convicted Piervinanzi of wire fraud, attempted bank fraud, attempted money laundering, and money laundering charges stemming from a separate but related scheme targeting an account at Morgan Guaranty Trust Company ("Morgan Guaranty"). The district court sentenced Piervinanzi to concurrent terms of 210 months imprisonment on each of seven counts of conviction, imposed a five-year term of supervised release for one attempted money laundering count and concurrent three-year terms of supervised release on the six other counts, and fined him $10,000. The court sentenced Tichio to concurrent terms of 135 months imprisonment on each of his three counts of conviction, and to concurrent three-year terms of supervised release.

We vacate Piervinanzi's conviction for money laundering under 18 U.S.C. § 1957, and remand both cases to the district court for resentencing. We affirm the convictions in all other respects.

## Background

This case involves two separate but related schemes to transfer funds electronically out of banks and overseas. The basic facts are not in dispute.

### A. *The Irving Trust Scheme.*

From 1982 to 1988, Lorenzo DelGiudice was an auditor and computer operations specialist for Irving Trust. DelGiudice was responsible for monitoring and improving the security of the bank's wire transfer procedures to prevent unauthorized transfers. In March 1988, Anthony Marchese told DelGiudice that he and Piervinanzi were planning to rob an armored car. DelGiudice suggested a less violent alternative—an unauthorized wire transfer of funds from Irving Trust into an overseas account. DelGiudice explained that he could use his position at Irving Trust to obtain the information necessary to execute such a transfer. DelGiudice also explained that it would be necessary to obtain an overseas bank account for the scheme to succeed, because (1) United States banking regulations made the rapid movement of proceeds difficult, and (2) a domestic fraudulent transfer could, if detected, be readily reversed.

[*] The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

1. John M. Bookhart, Jr. was initially indicted as a codefendant for an unrelated scheme with Tichio to defraud Bank Leumi. The two counts regarding this scheme were severed prior to trial. Bookhart pled guilty to one count of bank fraud, and was sentenced by Judge Leisure to fourteen months imprisonment. Bookhart appealed to this court, but his counsel filed a motion and brief pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and we granted both counsel's motion to be relieved and the government's motion for summary affirmance of Bookhart's conviction.

Marchese then introduced DelGiudice to Tichio. After DelGiudice explained the wire transfer scheme to Tichio, Tichio said that he could provide a foreign account to receive the stolen funds. Tichio made arrangements with Dhaniram Rambali, a business associate, to use Rambali's personal account at First Home Bank in the Cayman Islands to receive the stolen funds. Tichio then told DelGiudice that he would be able to provide access to accounts in the Cayman Islands, and emphasized that the strong bank secrecy laws there would prevent tracing of the purloined funds. Tichio told DelGiudice that the $10 million they were then planning to steal could be repatriated in monthly amounts of $200,000.

DelGiudice and Marchese distrusted Tichio's commitment to repatriate the money to them and feared for their safety, especially in view of the protracted payout schedule that Tichio had proposed. Marchese suggested that Piervinanzi be recruited to provide security for the operation; Piervinanzi's reputed ties to organized crime, he suggested, would deter Tichio from treachery or violence. Marchese and Tichio then met with Piervinanzi, who agreed to participate in the scheme and ensure that no one would "be hurt." Piervinanzi thereafter asked his brother, Robin Piervinanzi ("Robin"), to make the telephone call to Irving Trust that would initiate the transfer of funds to the Cayman Islands. Primarily in order to compensate Piervinanzi for his efforts, the conspirators increased the amount they planned to steal from $10 million to $14 million, of which DelGiudice and Marchese would receive $4 million each, and Tichio and Piervinanzi would receive $3 million each.

Despite Piervinanzi's participation, DelGiudice remained concerned about his safety, and decided to "sabotage [the] deal." However, DelGiudice did not want his coconspirators to know that he was intentionally frustrating their efforts. Accordingly, when he created the script that Robin would read when calling Irving Trust, DelGiudice left one necessary piece of information out of it: the name of a bank in the United States that would serve as the correspondent bank of

First Home Bank in the Cayman Islands.[2] DelGiudice knew that if this information was not provided by the caller, it was likely that the transaction would not be consummated.

On July 6, 1988, Robin called Irving Trust and identified himself as "Joseph Herhal," an officer at Beneficial Corporation ("Beneficial"), whose Irving Trust account had been selected by DelGiudice for the transfer. Robin instructed a clerk to wire $14.2 million from the Beneficial account to Rambali's account at First Home Bank in the Cayman Islands. Reading from the script provided by DelGiudice, Robin supplied all required information except the identity of the correspondent bank. In the course of processing the transaction, the clerk contacted Beneficial to ask the identity of the American correspondent bank for First Home Bank. The clerk then learned that Beneficial had not requested the wire transfer, and halted the transaction. To deflect suspicion from himself, DelGiudice told Marchese that Irving Trust had stopped the transfer because First Home Bank was a "fly by night" operation.

### B. The Morgan Guaranty Scheme.

In July 1988, in a move unrelated to the attempted bank fraud, DelGiudice left his job at Irving Trust and accepted a "better position" at Morgan Guaranty as audit manager. His first assignment at Morgan Guaranty was to perform an audit of the bank's wire transfer department. During the autumn of 1988, DelGiudice, Marchese, and Piervinanzi began planning a fraudulent wire transfer from Morgan Guaranty. DelGiudice agreed to acquire the necessary information for the transfer; Marchese and Piervinanzi took responsibility for arranging other aspects of the scheme, such as locating an overseas bank account to receive the stolen funds, recruiting a "caller" to initiate the wire transfer, and arranging for the distribution of the proceeds. They agreed that Tichio would not be involved in the Morgan Guaranty scheme.

Marchese and Piervinanzi contacted Philip Wesoke, a self-styled "financial consultant" who had previously invested (and lost) money

---

**2.** Under banking practice, money cannot be transferred overseas directly, but must instead go through a correspondent bank where the recipient offshore bank has an account.

for Piervinanzi. Marchese and Piervinanzi told Wesoke that they represented individuals who wanted to invest $14 to $20 million discreetly in a liquid, unregistered asset. Marchese and Piervinanzi told Wesoke that the investment could be "settled" overseas, and Piervinanzi mentioned the Cayman Islands, saying that he and Marchese had recently completed a transaction there. Having learned from the aborted Irving Trust scheme that correspondent bank information was necessary to transfer funds out of the country, Piervinanzi told Wesoke to provide the identity of a correspondent bank.

Wesoke recommended, and Piervinanzi and Marchese agreed, that they invest in diamonds. Wesoke accordingly arranged for a syndicate of Israeli diamond dealers to assemble a portfolio of diamonds for the conspirators. Wesoke also provided Piervinanzi with the necessary account and correspondent bank information for the planned recipient bank.

DelGiudice had selected an account of Shearson Lehman Hutton, Inc. ("Shearson") at Morgan Guaranty as his target, and compiled the necessary information for the transfer. Piervinanzi gave DelGiudice the information that Wesoke had provided concerning the recipient bank and its American correspondent bank. DelGiudice then met with Robin, who again was chosen to make the call that would trigger the fraudulent transfer. DelGiudice provided Robin with the appropriate Morgan Guaranty telephone number, dictated a script for him to use, and told him when to make the call.

On February 23, 1989, Robin telephoned Morgan Guaranty and, purporting to be Shearson employee William Cicio, directed a wire transfer of $24 million to the selected account in London, with Bankers Trust Company in New York ("Bankers Trust") serving as the correspondent bank. Although Robin supplied all the information needed to complete the transfer, Morgan Guaranty's clerk became suspicious because she had spoken with Cicio previously, and discerned that the voice on the telephone was not Cicio's. The clerk processed the transfer, but reported her suspicions to a supervisor. Either the supervisor or the clerk then contacted Shear-son and learned that the transaction had not been authorized. Although the $24 million had already reached Bankers Trust, the wire transfer was stopped and reversed.

## C. *The Proceedings Below.*

### 1. *Indictment and Trial.*

The FBI arrested Piervinanzi on March 2, 1989 for his participation in the Morgan Guaranty scheme. On March 20, 1989, the original indictment was filed in this case, charging Piervinanzi alone with one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. A twenty-three count superseding indictment was filed on December 18, 1990. This indictment was redacted to seven counts at trial. Counts one through three involved the Irving Trust scheme, while counts four through seven involved the Morgan Guaranty scheme. Count one charged Piervinanzi and Tichio with conspiracy to commit wire fraud, bank fraud, and money laundering in violation of 18 U.S.C. § 371. Count two charged Piervinanzi and Tichio with attempted bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Count three charged Piervinanzi and Tichio with attempted money laundering in violation of 18 U.S.C. § 1956(a)(2) and 2. Count four charged Piervinanzi with wire fraud in violation of 18 U.S.C. §§ 1343 and 2. Count five charged Piervinanzi with attempted bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Count six charged Piervinanzi with attempted money laundering in violation of 18 U.S.C. §§ 1956(a)(2) and 2. Count seven charged Piervinanzi with money laundering in violation of 18 U.S.C. §§ 1957(a) and 2. Trial commenced on May 1, 1991 and concluded on May 17, 1991, when the jury returned a verdict convicting Piervinanzi and Tichio on all counts.

### 2. *Sentencing of Piervinanzi.*

At sentencing, Piervinanzi requested a downward departure on several grounds, arguing principally that: (1) the conduct underlying his money laundering convictions fell outside the "heartland" of the money laundering Guideline, and was more properly sentenced as bank fraud; and (2) he was suffering from diminished mental capacity at

the time of the offense. In contending that the conduct underlying his money laundering convictions was more appropriately characterized as bank fraud, Piervinanzi cited the commentary to USSG § 2S1.1, the legislative history of pertinent money laundering statutes, and this court's opinion in *United States v. Skinner*, 946 F.2d 176, 179–80 (2d Cir.1991), in which we held that a sentencing court may depart downward if the conduct underlying a money laundering conviction falls outside the "heartland" of the conduct addressed by the money laundering statute. In denying the downward departure motion, Judge Leisure found that Piervinanzi's conduct, involving the attempted transfer of $38 million in fraud proceeds overseas, constituted "a heartland case for a money laundering offense."

The court confronted diametrically opposed professional opinions concerning Piervinanzi's capacity. The diminished capacity claim stemmed from severe injuries that Piervinanzi had sustained in a 1984 car accident. The defense's psychologist concluded that Piervinanzi suffered from "post-traumatic stress disorder" as a result of the accident, which left Piervinanzi "vulnerable to any propositions that might offer him an opportunity to enhance his sense of self worth." The psychologist concluded that Piervinanzi's participation in the bank fraud schemes was "a function of the significantly diminished mental capacity that resulted from his Post-traumatic Stress Disorder."

The government's psychiatrist pointed out that: (1) letters submitted on Piervinanzi's behalf at sentencing indicated that he "was able to function to a large degree and had formed positive interpersonal relationships;" (2) Piervinanzi had sought no psychiatric treatment after the 1984 accident; and (3) his role in the Irving Trust and Morgan Guaranty schemes involved planning and collaboration that "would be difficult for one whose mental capacity was significantly reduced due to mental disease." The government's psychiatrist concluded that there was no basis to conclude that Piervinanzi "had a significantly reduced mental capacity to evaluate his actions or the actions of those around him," or that there was any "connection between his ongoing actions at the time of the offenses and psychological symptoms."

The district court declined to grant Piervinanzi a downward departure for diminished mental capacity, concluding that Piervinanzi had not shown "that there was some impairment of his mental functioning which caused him unwittingly to be involved in this scheme," and that "his own conduct and actions and conversations belie that position." The court added that the government's position that there was "no connection between the [asserted] diminished capacity and the criminal activity itself" was "well-taken."

USSG § 2S1.1(a)(1) prescribes a base offense level of twenty-three for violations of § 1956(a)(2). The court increased the base by eleven levels to account for the amount of the potential loss, $38 million dollars, *see id.,* § 2S1.1(b)(2)(L), for a total offense level of thirty-four. Given Piervinanzi's criminal history category of III, the applicable Guidelines range for the money laundering offenses (counts three, six, and seven) was 188–235 months. Although the applicable statutory maximum sentence for the conspiracy, wire fraud, and attempted bank fraud convictions (counts one, two, four, and five) was five years imprisonment, *see* 18 U.S.C. §§ 371, 1343, 1344,[3] the court sentenced Piervinanzi to concurrent terms of 210 months imprisonment on each of the seven counts of conviction.

### 3. *Sentencing of Tichio.*

Tichio also sought a downward departure on the basis that the Irving Trust scheme was "nothing more than a modern day bank robbery," and thus his conduct fell outside the heartland of the money laundering statute. Although recognizing his authority to grant a downward departure under applicable law, Judge Leisure declined to do so. Judge Leisure concluded that Tichio's con-

---

**3.** Section 1344 has since been amended to provide for a maximum sentence of thirty years. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 961(k), 103 Stat. 183, 500; Crime Control Act of 1990, Pub.L. No. 101–647, § 2503(j), 104 Stat. 4789, 4861.

duct fell within the heartland of the conduct prohibited by the money laundering guidelines, and that even if it were not within this heartland, he would not grant a downward departure. The court added nine levels to the base offense level of twenty-three to account for the potential loss attributable to the Irving Trust scheme, for a total offense level of thirty-two. *See* USSG § 2S1.1(a)(1), (b)(2)(J). Because Tichio had a criminal history category of I, the applicable Guidelines range for the attempted money laundering offense (count three) was 121–151 months. The court sentenced Tichio to 135 months imprisonment on counts one, two, and three, to run concurrently, although the statutory maxima for counts one (18 U.S.C. § 371) and two (18 U.S.C. § 1344, *cf. supra* note 3) were five years.

This appeal followed.

### Discussion

On appeal, Piervinanzi argues that: (1) his conduct did not violate the federal money laundering statutes under which he was convicted, 18 U.S.C. §§ 1956(a)(2) & 1957(a); (2) the first of his four trial attorneys had a conflict of interest that resulted in the deprivation of his Sixth Amendment right to counsel; and (3) the district court incorrectly failed to grant him a downward departure for diminished capacity pursuant to USSG § 5K2.13. Tichio contends that his conduct did not come within the "heartland" of the money laundering guideline, and accordingly that he should have been accorded a downward departure and sentenced according to the guideline for his "real crime" of bank fraud. He also joins in Piervinanzi's arguments, *see* Fed.R.App.P. 28(i), thus associating himself with the claim that § 1956(a)(2) is inapplicable to the Irving Trust scheme.

■ As an initial matter, we note that the district court imposed sentences for counts one, two, four, and five in excess of the statutory maxima authorized for the crimes charged therein. Piervinanzi received concurrent sentences of 210 months imprisonment for counts one, two, four, and five, while Tichio received concurrent sentences of 135 months imprisonment for counts one and two. The maximum applicable sentence under 18 U.S.C. §§ 371, 1343, and 1344 (*cf. supra* note 3) is five years. We accordingly vacate the excessive sentences and remand for resentencing on these counts. *See United States v. Restrepo*, 986 F.2d 1462, 1462–63 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993).

We turn to the arguments presented on appeal by Piervinanzi and Tichio.

### A. *Money Laundering Conviction of Piervinanzi under § 1957(a).*

Piervinanzi was convicted on count seven of the indictment of violating 18 U.S.C. § 1957(a) for his participation in the Morgan Guaranty scheme. This statute provides in relevant part:

(a) Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

. . . .

(f) As used in this section—

. . . .

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

As defined in § 1956, "specified unlawful activity" includes bank fraud. *See* § 1956(c)(7)(D).[4]

■ Count seven charged that Piervinanzi violated § 1957 by fraudulently causing the

---

4. As initially enacted, section 1956(c)(7)(D) specifically listed "an offense under ... section 1344 (relating to bank fraud)" as a "specified unlawful activity." *See* 18 U.S.C. § 1956(c)(7)(D) (1988). This listing was deleted in 1992 as redundant, *see* Housing and Community Development Act of 1992, Pub.L. No. 102–550, § 1524(1), 106 Stat. 3672, 4064, presumably because bank fraud is comprehended in the reference in § 1956(c)(7)(A) to "any act or activity constituting an offense listed in section 1961(1) of [title 18]."

transfer of approximately $24 million from Morgan Guaranty. Piervinanzi argues that the language of the statute only encompasses transactions in which a defendant first obtains "criminally derived property," and then engages in a monetary transaction with that property. Because the funds transferred from Morgan Guaranty were not yet property derived from the wire fraud and bank fraud scheme, Piervinanzi contends, his actions did not come within the purview of § 1957. The government does not dispute this reading of the statute, and joins Piervinanzi's request to vacate his conviction on this count.

■ "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Thus, the first canon of statutory construction is that "a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* — U.S. —, —, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (collecting cases). Indeed, "[w]hen the words of a statute are unambiguous, ... this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). Finally, "'unless otherwise defined, [statutory] words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Harris v. Sullivan,* 968 F.2d 263, 265 (2d Cir.1992) (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)).

The language of § 1957 supports Piervinanzi's interpretation of that statute. The ordinary meaning of the word "obtained" entails possession of a thing. *See* Webster's Third New International Dictionary 1559 (1986). Similarly, the word "property" implies ownership, or the "exclusive right to possess, enjoy, and dispose of a thing." *Id.* at 1818. The use of such language demonstrates a congressional intent that the proceeds of a crime be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957. *See United States v. Johnson,* 971 F.2d 562, 569 (10th Cir.1992) ("both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity"); *United States v. Lovett,* 964 F.2d 1029, 1042 (10th Cir.) ("Congress intended [§ 1957] to separately punish a defendant for monetary transactions that follow in time the underlying specified unlawful activity that generated the criminally derived property in the first place.") (citing H.R.Rep. No. 855, 99th Cong., 2d Sess., pt. 1, at 7 (1986) (the "House Report")), *cert. denied,* — U.S. —, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992).

Piervinanzi and his colleagues succeeded in transferring $24 million from Morgan Guaranty to Bankers Trust, but these funds never came into the possession or under the control of the conspirators. Thus, Piervinanzi was improperly convicted of money laundering in violation of § 1957, and we reverse his conviction on count seven.

**B. *Money Laundering Convictions under § 1956(a)(2).***

Piervinanzi contends that the proof at trial did not establish the elements of money laundering or attempted money laundering under 18 U.S.C. § 1956(a)(2), and therefore that his convictions under counts three and six of the indictment must be reversed. He argues that § 1956(a)(2) is not violated unless there is some "secondary laundering activity not previously made criminal by pre-existing criminal statutes." Accordingly, he contends, because the asserted criminal laundering activity, the overseas transfer of the bank funds, was simply a component of the bank frauds that the conspirators attempted to perpetrate against Irving Trust and Morgan Guaranty, there was no analytically distinct "secondary" activity, and thus no criminal laundering violative of § 1956(a)(2).

Before addressing this contention, however, we must consider a statutory issue that has not been raised by the parties, and pertains only to the Irving Trust scheme.

**1. *Language of § 1956(a)(2) Applicable Only to Irving Trust Scheme.***

At the time of the Irving Trust scheme (March–July 1988), § 1956(a)(2) read in pertinent part:

(2) Whoever *transports* or *attempts to transport* a monetary instrument or funds from a place in the United States to or through a place outside the United States . . .

 (A) with the intent to promote the carrying on of specified unlawful activity, . . . shall be sentenced to a fine . . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2) (Supp. V 1987) (emphasis added).

After the failure of the Irving Trust scheme, but prior to the execution of the Morgan Guaranty scheme in February 1989, Congress amended subsection (a)(2) of § 1956 to apply to

Whoever *transports, transmits, or transfers,* or *attempts to transport, transmit, or transfer* a monetary instrument or funds from a place in the United States to or through a place outside the United States. . . .

18 U.S.C. § 1956(a)(2) (1988) (emphasis added); *see* Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 6471(b), 102 Stat. 4181, 4378 (enacted Nov. 18, 1988). Subsection (A) remained unchanged.[5]

Although the parties have not put the question before the court, we must consider whether § 1956 as it stood at the time of the Irving Trust scheme, prohibiting only "trans-

**5.** Section 1956(a)(2) has subsequently been amended in ways not germane to this litigation. *See* Crime Control Act of 1990, Pub.L. No. 101–647, § 108, 104 Stat. 4789, 4792; Housing and Community Development Act of 1992, Pub.L. No. 102–550, § 1531(a), 106 Stat. 3672, 4066.

**6.** Section 2314 was amended, as part of the same legislative enactment that similarly amended § 1956(a)(2), to apply to "[w]hoever transports, transmits, or transfers . . . money." *See* Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 7057(a), 102 Stat. 4181, 4402 (1988). Senator Biden, chairman of the Senate Judiciary Committee (which considered and reported these amendments), commented that both amendments were meant to clarify Congress' original purpose in prohibiting both physical transportation and wire transfer of money. He stated that the amendment to § 1956(a)(2)

would clarify that the term "transports" in the money laundering statute was intended to include electronic and other forms of movement of funds other than physical transportation. 134 Cong.Rec. S17367 (statement of Sen. Biden).

port[ation]" of "funds" to an overseas destination, applied to wire transfers. The term "transport" is not defined in the statute. It could be argued that the ordinary meaning of the term, i.e., to "carry" or "convey" a thing from one place to another, *see* Webster's Third New International Dictionary 2430, denotes only the physical transportation of an object and does not encompass wire transfers. *See* G. Richard Strafer, *Money Laundering: The Crime of the '90's,* 27 Am.Crim. L.Rev. 149, 163 n. 86 (1989).

■ We conclude, however, that the plain language of the statute applies to wire transfers as well as physical conveyances of money. The term "transports" must be considered in light of the objects to be transported, that is, "monetary instrument[s] or funds." As the Ninth Circuit has observed, "where money is concerned, a contemporary meaning of 'transport' would have to include a wire transfer, since funds are increasingly 'conveyed' electronically." *United States v. Monroe,* 943 F.2d 1007, 1015 (9th Cir.1991) (construing language of § 1956(a)(2) prior to its 1988 amendment), *cert. denied,* —— U.S. ——, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992). Similarly, this court has construed 18 U.S.C. § 2314, which then prohibited the "transport[ation] in foreign or interstate commerce [of] . . . money," to include wire transfers,[6] as follows:

He also observed that the amendment to § 2314 was designed to codify appellate court holdings that 18 U.S.C. [§] 2314 is not limited to the physical transportation of stolen or fraudulently acquired money or property but also extends to the situation in which such proceeds are transmitted or transferred electronically in interstate or foreign commerce. Noting that . . . in modern times banks seldom move funds physically but rather do so through electronic transfers, three courts of appeals have recently rejected contentions that section 2314 is limited—because of the use of the verb "transports"—to instances of physical asportation [sic] of money. *United States v. Gilboe,* 684 F.2d 235 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983); *United States v. Wright,* 791 F.2d 133 (10th Cir.1986); *United States v. Goldberg,* 830 F.2d 459 (3d Cir.1987). No contrary ruling exists. Nevertheless, in order to clarify the statute and avoid further litigation, it seems appropriate to add verbs—"transmits" and "transfers"—that clearly reach acts of electronic movement of money.

The question whether the section covers electronic transfers of funds appears to be one of first impression, but we do not regard it as a difficult one. Electronic signals in this context are the means by which funds are transported.... Indeed, we suspect that actual dollars rarely move between banks, particularly in international transactions.

*United States v. Gilboe,* 684 F.2d 235, 238 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

As best we can ascertain, every other court that has considered this question has reached the same conclusion. *See United States v. LaSpesa,* 956 F.2d 1027, 1035 (11th Cir.1992) (construing § 2314); *Monroe,* 943 F.2d at 1015 (construing § 1956(a)(2)); *United States v. Kroh,* 896 F.2d 1524, 1528–29 (8th Cir.) (construing § 2314, *rehearing granted, judgment vacated on other grounds,* 904 F.2d 450 (8th Cir.), *on rehearing,* 915 F.2d 326 (8th Cir.1990) (in banc); *United States v. Goldberg,* 830 F.2d 459, 466–67 (3d Cir.1987) (same); *United States v. Wright,* 791 F.2d 133, 136–37 (10th Cir.1986) (same).

We accordingly turn to the argument made by Piervinanzi that § 1956(a)(2) does not provide a valid basis for his conviction on counts three and six of the indictment.

### 2. *Scope of Section 1956(a)(2).*

Piervinanzi contends that the language of § 1956(a)(2) (1988), its legislative history, pertinent case law, the United States Attorneys' Manual guidelines for prosecutions under the statute, and relevant Sentencing Guidelines commentary all support the conclusion that this provision proscribes only "laundering" activity that is analytically distinct from the underlying criminal activity that it promotes, and that the overseas fund transfers intended in this case do not satisfy this statutory requirement. For the reasons that follow, we reject his reading of § 1956(a)(2).

*Id.* at S17370.

**7.** Section 1956(a)(1) provides in relevant part:

#### a. *Statutory Language.*

The statutory language at issue requires that there be a transmission of funds "with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(2)(A). As previously noted, "specified unlawful activity" includes bank fraud. *See supra* note 4 and accompanying text. The counts (three and six) of the indictment that charge violations of § 1956(a)(2) both specify that the overseas fund transfers were designed to further "a fraudulent scheme in violation of 18 U.S.C. § 1344 [i.e., bank fraud]."

Piervinanzi contends that in this case, the overseas transmission of funds "merges" with the underlying bank fraud, precluding independent liability under § 1956(a)(2). In our view, however, the conduct at issue in this case falls within the prohibition of the statute. The conspirators understood the use of overseas accounts to be integral to the success of both the Irving Trust and Morgan Guaranty schemes. DelGiudice explained to the other conspirators that use of foreign accounts would make the fraudulently obtained funds more difficult to trace. Tichio obtained access to Rambali's Cayman Islands bank account because he understood that bank secrecy laws there would hamper official efforts to recover the stolen funds. Similarly, Piervinanzi and Marchese told Wesoke that they wished to "settle[ ]" their transaction overseas. Because transferring the funds overseas (and beyond the perceived reach of U.S. officials) was integral to the success of both fraudulent schemes, it is undeniable that the attempted transfers were designed to "promote" the underlying crime of bank fraud. Contrary to Piervinanzi's assertion, this reading of the statute does not "merge" the underlying criminal activity and promotion through laundering into one. The act of attempting to fraudulently transfer funds out of the banks was analytically distinct from the attempted transmission of those funds overseas, and was itself independently illegal. *See* 18 U.S.C. § 1344.

Analysis of the overall structure of § 1956 confirms this interpretation. Section 1956(a)(1),[7] the domestic money laundering

Whoever, knowing that the property involved in a financial transaction *represents the proceeds of some form of unlawful activity,*

statute, penalizes financial transactions that "involv[e] ... the proceeds of specified unlawful activity." The provision requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds with the intent to promote specified unlawful activity.[8] By contrast, § 1956(a)(2) contains no requirement that "proceeds" first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach. Instead, it penalizes an overseas transfer "with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(2)(A).

▄ The fact that Congress uses different language in defining violations in a statute indicates that Congress intentionally sought to create distinct offenses. *Cf. Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (Congress presumed to act intentionally when it includes particular language in one section of a statute but omits it from another); *United States v. Pimental,* 979 F.2d 282, 284 (2d Cir.1992) (same), *cert. denied,* — U.S. —, 113 S.Ct. 2458, 124 L.Ed.2d 672 (1993). The clearly demarcated two-step requirement which Piervinanzi advocates in the construction of § 1956(a)(2) is apparent in other provisions of the federal money laundering statutes, but not in § 1956(a)(2). We have no authority to supply the omission.

▄ Piervinanzi also contends that the prohibition in § 1956(a)(2)(A) of "carrying on" underlying criminal activity would be meaningless, and the phrase rendered superfluous, unless it connotes continuous criminal activity that is not presented by the discrete bank frauds in this case. (This argument could be presented even more strongly by Tichio, who engaged in only one of the attempted frauds.) The "specified unlawful activity" that must be "carried on" to result in a § 1956(a)(2) violation, however, is consistently defined in each paragraph of § 1956(c)(7) as including discrete, singular offenses, as follows: *"any act* or activity constituting an offense" (paragraph (A), emphasis added); *"an offense "* (paragraph (B), emphasis added); *"any act "* or acts constituting a continuing criminal enterprise" (paragraph (C), emphasis added); and *"an offense "* (paragraph (D), emphasis added). Thus, we conclude, § 1956(a)(2) can be satisfied by the "carrying on" of a single offense of "bank fraud," and "carrying on" in § 1956(a)(2), rather than connoting continuous criminal activity, has essentially the same meaning as "conducts" in § 1956(a)(1). Indeed, this is the primary meaning of "carry on." *See* Webster's Third New International Dictionary 344.

b. *Legislative History.*

The relatively scanty legislative history of § 1956(a)(2), *see United States v. Stavroulakis,* 952 F.2d 686 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992), supports this analysis. The Senate report on the version of the bill reported to the Senate explains that § 1956(a)(2) is "designed to illegalize international money laundering transactions," and "covers situations in which money is being laundered ... by transferring it out of the United States." S.Rep. No. 433, 99th Cong., 2d Sess. 11 (1986) (the "Senate Report"). The Senate Report's discussion of § 1956(a)(2) is conspicuously silent about any requirement that the funds be proceeds of some distinct activity, merely stating that the statute is violated when a defendant "engage[s] in an act of transporting or attempted transporting and either intend[s] to facilitate a crime or know[s] that the transaction was designed to facilitate a crime." *Id.*[9] By contrast, the

---

conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

 (A)(i) with the intent to promote the carrying on of specified unlawful activity, ...

shall be sentenced to a fine ... or imprisonment for not more than twenty years, or both. Emphasis added.

**8.** In this respect, § 1956(a)(1) is similar to § 1957(a), which requires the separate obtention of "criminally derived property" followed by a monetary transaction with that property. *See supra* part A of this Discussion.

**9.** As Piervinanzi points out, the language of § 1956(a)(2) was subsequently amended prior to its enactment to substitute "promotes" for "facil-

Senate Report explains that § 1956(a)(1) "requires that the property involved in a transaction must in fact be proceeds of 'specified unlawful activity'...." *Id.* at 10.

Piervinanzi points out that a pertinent House report states in general terms that "[t]his bill ... will punish transactions that are undertaken with the proceeds of crimes or that are designed to launder the proceeds of crime." House Report at 7. However, the version of the statute upon which this report comments was substantially different from that ultimately enacted. Rather than prohibiting overseas transfers made "with the intent to promote the carrying on of specified illegal activity," as the enacted § 1956(a)(2) provides, the version of the bill discussed in the House Report would have applied to overseas transfers made "to conceal *criminally derived property* that is derived from a designated offense, or ... to disguise the source of ownership of, or control over, *criminally deprived property* that is derived from a designated offense." House Report at 2 (emphasis added). The House Report thus discusses a version of the money laundering bill too different from that enacted to be of any use in divining congressional intent with respect to the enacted provisions of § 1956. Indeed, the broader language that Congress ultimately adopted bespeaks an intention not to be constrained to punishing laundering activity involving separately derived criminal property.

#### c. *Case Law.*

Nor do the precedents invoked by Piervinanzi sustain his position. He points, for example, to the following statement in *Stavroulakis:*

> Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money. Why and how that money got dirty is defined in other statutes. *Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived.*

952 F.2d at 691 (emphasis added). In the context of this case, the emphasized language

is a truism that begs the question whether the intended overseas transfers should be considered as separate secondary "laundering" or a component of the underlying bank fraud.

Our opinion in *United States v. Skinner,* 946 F.2d 176 (2d Cir.1991), is considerably more relevant. Concededly, in that case we construed § 1956(a)(1), which requires that separate proceeds be utilized in a financial transaction. *See supra* note 7. Our focus in *Skinner,* however, was upon the statutory requirement, identical in this respect to § 1956(a)(2)(A), that a financial transaction be undertaken "with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(1)(A)(i). We concluded that this language applied to the transportation of money orders to pay for purchases of cocaine. Although the transactions "in reality represented only the completion of the sale" of cocaine, 946 F.2d at 179, we concluded that they were made to facilitate the sale of cocaine and thus were made "with the intent to promote the carrying on of specified unlawful activity." *See id.* at 178.

A number of cases from other circuits support this view. In *United States v. Cavalier,* 17 F.3d 90 (5th Cir.1994), the Fifth Circuit ruled that the transfer of a single check to complete a mail fraud "promote[d] the carrying on" of that fraud within the meaning of § 1956(a)(1)(A)(i). *See id.* at 91. The Ninth Circuit ruled similarly with respect to the deposit of a single check to complete a violation of the Hobbs Act. *See United States v. Montoya,* 945 F.2d 1068, 1076 (9th Cir.1991). And the Third Circuit held that the cashing of government checks to complete mail frauds perpetrated against the Internal Revenue Service constituted a § 1956(a)(1) violation, although the proceeds of the fraud were concededly spent for personal purposes and not "plowed back" into the criminal venture. *See United States v. Paramo,* 998 F.2d 1212, 1216–18 (3d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994).

---

itates." We do not regard this amendment as altering the outcome in this case. The overseas transfers contemplated by the conspirators

would clearly have both facilitated and promoted the underlying bank fraud that they hoped to achieve. ·

Similarly, we are not persuaded by Piervinanzi's references to *United States v. Jackson,* 935 F.2d 832 (7th Cir.1991), and *United States v. Hamilton,* 931 F.2d 1046 (5th Cir. 1991). *Jackson* comments that § 1956(a)(1)(A)(i) is "aimed at ... the practice of plowing back proceeds of 'specified unlawful activity' to promote that activity." 935 F.2d at 842. *Hamilton* states that § 1956(a)(2) is meant to criminalize the transfer of funds "that would contribute to the growth and capitalization of the drug trade or other unlawful activities." 931 F.2d at 1052. In both cases, the same statutory language ("promote the carrying on of specified unlawful activity," § 1956(a)(1)(A)(i) and (a)(2)(A)) is construed.

The *Jackson* comment faithfully reflects the facts of that case, in which a violation of § 1956(a)(1) was premised upon the use of proceeds from drug sales to purchase beepers for use by participants in the criminal drug enterprise. *See* 935 F.2d at 841. We agree with *Paramo,* however, that *Jackson* did not intend "either to delineate the universe of conduct prohibited under section 1956(a)(1)(A)(i), or to decide whether a defendant could violate that section other than by plowing back the proceeds of unlawful activity." *Paramo,* 998 F.2d at 1218. The focus in *Hamilton* was upon the violation of § 1956(a)(2) involved in a hypothetical transfer of legitimately derived funds from a foreign source to the United States to capitalize a domestic drug enterprise. *See* 931 F.2d at 1052.

Neither case establishes that a defendant may be deemed to "promote the carrying on of specified unlawful activity" *only* when the laundering would promote subsequent criminal activity. As previously discussed, such a reading would not accord with the plain meaning of the statute. Further, *Hamilton* involved a scheme similar to that in *Skinner,* in which the proceeds of drug sales were sent through the mails to pay for a drug purchase. *See* 931 F.2d at 1051. As in *Skinner,* the defendant was convicted of violating § 1956(a)(1), although there was no indication that the transferred proceeds were to be invested in subsequent illegal activities. *See* 931 F.2d at 1051–52.

d. *United States Attorneys' Manual Guidelines.*

Piervinanzi argues that Department of Justice guidelines set forth in the United States Attorneys' Manual ("USAM") support a narrower reading of the statute. A memorandum supplementing USAM 9–105.000 requires that United States Attorneys consult with the Department of Justice before bringing money laundering charges

[i]n any case where the conduct to be charged as "specified unlawful activity" under §§ 1956 and 1957 consists primarily of one or more financial or fraud offenses, and where the financial and money laundering offenses are so closely connected with each other that there is no clear delineation between the underlying financial crime and the money laundering offense.

United States Department of Justice, United States Attorneys' Manual Staff, Memorandum re Money Laundering Prosecutions and Forfeitures, Oct. 1, 1992, at 5 ("USAM Memorandum").

■■■■ These guidelines, however, provide no substantive rights to criminal defendants. In addressing a similar Department of Justice directive, the First Circuit ruled that "the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party." *United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.), *cert. denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990); *see also United States v. Ivic,* 700 F.2d 51, 64 (2d Cir.1983) ("non-compliance with internal [Justice Department] guidelines is not, of itself, a ground of which defendants can complain") (citing *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. Myers,* 692 F.2d 823, 846 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1993)); USAM 1–1.100 (Oct. 1, 1988) (USAM "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal"); *cf. Crandon v. United States,* 494 U.S. 152, 177, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990) (Scalia, J.,

concurring) (because criminal statutes are "not administered by any agency but by the courts," the "interpretation of those charged with prosecuting criminal statutes" is not entitled to deference). Further, these guidelines reflect executive branch policy judgments about the desirability of certain types of prosecutions and are not guided solely by the language of the statute.

In any case, these guidelines do not unequivocally support Piervinanzi's position. They merely establish a "general rule," USAM Memorandum at 5, and thus do not purport to preclude in all cases the filing of charges in cases in which the money laundering offense is closely related to the underlying financial crime. Indeed, the guidelines do not provide a bar to any prosecutions. Rather, they merely require United States Attorneys to consult with the Department of Justice before bringing money laundering prosecutions that fall within the terms of the guidelines.

### e. *Sentencing Guidelines Commentary.*

Finally, Piervinanzi contends that the following commentary to the sentencing guideline applicable to money laundering supports his position: "A higher base offense level is specified if the defendant is convicted under 18 U.S.C. § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A) because those subsections apply to defendants who encouraged or facilitated the commission of further crimes." USSG § 2S1.1, comment. (backg'd).

The phrase "further crimes" in this commentary is most plausibly read as referring to the "specified unlawful activity" to which reference is made in § 1956(a)(1)(A), (a)(2)(A), and (a)(3)(A), the "carrying on" of which the proscribed laundering activity must in each instance "promote." Thus, this commentary simply reiterates the essential terms of these statutes, without casting any significant light on how they should be construed. In any event, while such commentary is entitled to deference as an interpretation of the Guidelines, *see Stinson v. United States*, —— U.S. ——, —— - ——, 113 S.Ct. 1913, 1917–20, 123 L.Ed.2d 598 (1993), it is not reviewed by Congress, *see id.* at ——, 113 S.Ct. at 1919, and should not be consid-

ered an authoritative construction of the criminal statutes upon which the Guidelines are premised.

### C. *Piervinanzi's Conflict of Interest Claim.*

Shortly after Piervinanzi's arrest on March 2, 1989, Marchese arranged for attorney Jack Goldberg to represent Piervinanzi. Marchese delivered a $5,000 retainer to Goldberg towards a $20,000 pretrial legal fee for Piervinanzi's representation; DelGiudice paid another $7,000. Marchese told DelGiudice that if he didn't help pay for the retainer, Piervinanzi would "rat" on him. Marchese and DelGiudice met with Goldberg and told Goldberg "to keep [them] out of it." Speaking with his girlfriend on the telephone while in the Metropolitan Correctional Center prior to being released on bail, Piervinanzi repeatedly expressed concern that Goldberg might have divided loyalties.

The initial indictment, filed March 20, 1989, charged Piervinanzi with one count of mail fraud. A superseding indictment was filed on May 24, 1989 that added several counts and alleged that coconspirators of Piervinanzi had retained an attorney to represent him. The government then advised Goldberg that it intended to move to disqualify him, and made the motion on June 20, 1989. Goldberg withdrew as Piervinanzi's counsel on July 27, 1989.

On August 11, 1989, the grand jury returned a superseding indictment that named Piervinanzi and one coconspirator, Marchese. On September 6, 1989, Piervinanzi was arraigned on the superseding indictment, and attorney Lawrence Vogelman entered an appearance on his behalf. On February 6, 1990, DelGiudice signed a cooperation agreement with the government. DelGiudice testified at trial pursuant to that agreement, pled guilty to one count of wire fraud, and was sentenced to probation.

Although he did not raise the issue below, Piervinanzi now claims that: (1) Goldberg had a conflict of interest, and because of that conflict, deliberately failed to advise Piervinanzi of the possibility of cooperating with the government during the pretrial period; (2) the district court was on

notice of the conflict of interest after May 24, 1989, when the first superseding indictment alleged that coconspirators had retained Goldberg to represent Piervinanzi "in an attempt to preclude him from telling the truth about the co-conspirators and exposing their illegal activities;" and (3) the district court had a duty to advise Piervinanzi about the apparent conflict of interest. Piervinanzi urges this court to remand his case to the district court for a hearing to determine whether, as a result, Piervinanzi was denied his Sixth Amendment right to the effective assistance of counsel.

▆▆▆ The potential for conflict of interest is great when a criminal defendant is represented by a lawyer hired and paid by an unindicted coconspirator, because the lawyer may "prevent his client from obtaining leniency by preventing the client from offering testimony against [the coconspirator] or from taking other actions contrary to the [coconspirator's] interest." *Wood v. Georgia,* 450 U.S. 261, 269, 101 S.Ct. 1097, 1102, 67 L.Ed.2d 220 (1981). When a trial judge is made aware of an apparent conflict of interest, a duty of inquiry arises to protect the represented defendant's interests. *See id.* at 272, 101 S.Ct. at 1104; *Dunton v. County of Suffolk,* 729 F.2d 903, 908–09 (2d Cir.), *modified,* 748 F.2d 69 (2d Cir.1984).

On the facts presented in this case, however, we perceive no lapse on the part of the district court in addressing the conflict of which Piervinanzi complains. The court was arguably put on notice of the situation by an allegation in an indictment filed on May 24, 1989. Less than a month later, the government moved to disqualify Goldberg. Apparently without responding to the motion, Goldberg withdrew as Piervinanzi's counsel on July 27, 1989. No neglect or undue delay by the district court can plausibly be premised upon this record.

Furthermore, no prejudice appears. Piervinanzi was represented by conflict-free counsel beginning in September 1989, twenty months before trial and five months before DelGiudice, the government's primary witness against Piervinanzi at trial, signed his cooperation agreement with the government. During these five months, Piervinanzi could have offered the government information that would have been useful in prosecuting DelGiudice and the other coconspirators, but never did so. Moreover, Piervinanzi told the government's psychiatrist that the government had offered him a plea bargain involving a five year sentence prior to trial, but that he had rejected the offer.

D. *Piervinanzi's Diminished Capacity Claim.*

▆▆▆ Piervinanzi claims that the district court incorrectly applied the diminished capacity guideline, USSG § 5K2.13, p.s., by requiring that "the diminished capacity be the sole cause of [the] offense." He points to the following statement made by Judge Leisure during sentencing: "[T]he defense counsel is unable to show that there was some impairment of his mental functioning which caused him unwittingly to be involved in the scheme...."

Section 5K2.13 provides that:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

This provision establishes that two elements are required for a downward departure: "reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense." *United States v. Prescott,* 920 F.2d 139, 145–46 (2d Cir. 1990).

Judge Leisure's isolated statement is an insufficient basis from which to conclude that he employed an incorrect standard. Judge Leisure clearly inquired into the element of causation and found it to be missing, and accordingly accepted the government's position that "there's no connection between the diminished capacity and the criminal activity itself." The court's conclusion was based upon two experts' psychological reports, letters from persons who knew Piervinanzi, and

 

extensive argument of counsel. Although Piervinanzi presented some evidence that would have supported his claim, Judge Leisure, as the finder of fact, was in the best position to evaluate this information. His conclusion was not clearly erroneous, and we therefore decline to upset it on appeal. *See United States v. Sutton,* 13 F.3d 595, 599 (2d Cir.1994).

E. *Application of Money Laundering Guideline.*

 Tichio moved before the district court "for a downward departure from the Money Laundering guideline level of 32 to the Bank Fraud Level of 23 on the grounds that the typical conduct described in Section 2S1.1 of the Sentencing Guidelines was not the conduct for which [he] was convicted." The district court recognized its authority to grant a downward departure, but declined to do so.[10] Tichio renews this contention on appeal.

 A district court's exercise of judicial discretion not to grant a downward departure is normally unappealable. *United States v. Ritchey,* 949 F.2d 61, 63 (2d Cir. 1991) (per curiam) (collecting cases). We have recognized an exception to this general rule when a sentencing court mistakenly concludes that it lacks the legal authority to grant a downward departure. *See id.; Prescott,* 920 F.2d at 145–46 (collecting cases); *cf. Skinner,* 946 F.2d at 179–80 (remanding for resentencing upon concluding that "appellants' conduct was both atypical of the conduct described by the Sentencing Guidelines [i.e., USSG § 2S1.1] and inadequately considered by the Sentencing Commission, thus empowering the district court to consider a downward departure"). In this case, however, Judge Leisure was clearly aware of his authority to grant a downward departure, but declined to exercise it. *See supra* note 10 and accompanying text. Thus, we are without authority to consider Tichio's contention that a departure was improperly withheld from him.

Conclusion

We reverse Piervinanzi's conviction on count seven pursuant to 18 U.S.C. § 1957, vacate the sentences of Piervinanzi and Tichio, affirm in all other respects, and remand for resentencing.

---

10. In the course of the colloquy at Tichio's sentencing, the court also made clear that it had recognized, but declined to exercise, its departure authority in sentencing Piervinanzi that same day.