UNITED STATES of America, Plaintiff,

v.

ONE PARCEL OF REAL ESTATE COM-
MONLY KNOWN AS 2030 EAST MON-
ROE STREET, SPRINGFIELD, ILLI-
NOIS, With All Appurtenances and Im-
provements Thereon, Defendant.

No. 93–3167.

United States District Court,
C.D. Illinois,
Springfield Division.

May 9, 1995.

Esteban F. Sanchez, Asst. U.S. Atty.,
Springfield, IL, for plaintiff.

Joseph S. Miller, Springfield, IL, for de-
fendant.

## OPINION

RICHARD MILLS, District Judge:

Civil Forfeiture.

The claimant says she is an innocent owner.

The facts say she is not an owner at all.

At bench trial, the government sought to forfeit the defendant property as being purchased with the proceeds of drug sales and for being used to facilitate drug transactions. 21 U.S.C. §§ 881(a)(6) and 881(a)(7). The claimant said she was an innocent owner as defined in §§ 881(a)(6) and (a)(7). The government argued claimant has no standing to challenge the forfeiture or (in the alternative) claimant knew the defendant property was purchased with drug money and used to facilitate drug transactions.

Because the Court finds claimant does not have standing to contest the forfeiture, her innocent owner argument will not be addressed. Accordingly, the following discussion focuses solely on the issue of claimant's standing.

### Background

On June 3, 1993, Willis Gragg pled guilty to one count of conspiring to distribute cocaine and one count of attempting to possess cocaine with intent to distribute. On July 13, 1993 the United States filed a verified *in rem* Complaint against 2030 East Monroe seeking forfeiture of the property pursuant to 21 U.S.C. §§ 881(a)(6) and 881(a)(7). The Complaint alleged the property had been used to commit or to facilitate the commission of a violation of Title II of the Controlled Substance Act, 21 U.S.C. § 801 *et seq.*, punishable by more than one year of imprisonment and the property represented proceeds traceable to an illegal drug transaction punishable by more than one year of imprisonment.

Also on July 13, 1993, United States Magistrate Judge Charles H. Evans issued an Order finding probable cause for the seizure and forfeiture of 2030 East Monroe. Judge Evans' Order instructed the Clerk's office to issue a Warrant of Arrest *in rem* for the seizure of 2030 East Monroe. On July 19, 1993, Defendant 2030 East Monroe was seized by the United States Marshal.

Notice of the seizure and Complaint was given to Willis Gragg, Dorothy Gragg (Willis' wife), and Bernice Gragg (Willis' mother). Notice of the seizure was also published in The State Journal–Register, Springfield, Illinois, once a week for three consecutive weeks.

On July 26, 1993, Bernice Gragg and Richard Gragg (Willis' brother) filed verified claims to 2030 East Monroe. On the same day, Bernice and Richard filed answers to the government's verified Complaint.

The case was set for bench trial and discovery ensued. On August 15, 1994, Richard Gragg withdrew his claim to 2030 East Monroe. On September 9, 1994, the bench trial commenced. The parties stipulated there was probable cause to believe 2030 East Monroe was used to facilitate a drug transaction and that the property represented the proceeds of drug transactions.

Bernice Gragg proceeded to attempt to establish herself as an innocent owner pursuant to 21 U.S.C. §§ 881(a)(6) and 881(a)(7). To support her claim, Bernice called two witnesses, her son, Richard, and herself.

*Richard Gragg* testified that on October 17, 1988, he entered into a contract for deed with Hattie Horton to purchase three pieces of property, one of which was 2030 East Monroe. The purchase price was $18,000. Richard paid $6,000 down and agreed to make monthly installments of $500. The deed was executed the same day and placed in escrow. Richard took immediate possession of the real estate.

Richard began extensive renovation of the house located at 2030 East Monroe. No improvements were made to the other pieces of real estate. Richard presented receipts indicating he spent approximately $7,500 on materials to improve 2030 East Monroe. Richard completed the remodeling about four to six months after taking possession of 2030 East Monroe. It was Richard's intent to rent the premises after completing his renovations. The premises was never rented, however, and remained vacant until Willis and Dorothy moved into the house in August of 1989.

Richard also produced receipts from Hattie Horton showing he made his monthly payments from October 1988 until August 1989. In fact, the receipts indicate that as of August 28, 1989 Richard was six months ahead on his payments with the total balance due on the contract of $4,500. Richard testified that in the spring of 1989 he began to experience financial problems due to his addiction to crack cocaine. According to Richard, he asked his mother to help him with the monthly payments and to purchase materials needed to complete the renovation. On October 19, 1990, Richard quitclaimed his interest in 2030 East Monroe to his mother Bernice. Richard testified he deeded the property to his mother because she had taken over the payments on the contract for deed.

On cross-examination Richard was unable to explain why Hattie Horton was threatening to foreclose on him in the spring of 1989 when according to his records he was at least three months ahead on his payments. Furthermore, Richard had difficulty explaining how he could afford his own mortgage payment, the $500 monthly installment on 2030 East Monroe, and pay for the materials to renovate 2030 East Monroe. Ultimately, Richard claimed his then girlfriend, now wife, gave him money for the renovation.

*Bernice Gragg* then testified on her own behalf. Bernice testified that in the spring of 1989 her son Richard asked her to help him make payments on real estate purchased from Hattie Horton. Bernice agreed to help Richard and claimed to have made two payments of $1,000 to Hattie Horton to bring Richard up to date on his payments. Bernice stated that she received receipts for these payments; however, they listed Richard as the payee. Bernice testified that she also spent approximately $2,000 on kitchen cabinets, carpeting and a storm door.

Bernice testified that around August of 1989 her son Willis and his family moved from Memphis back to Springfield where Willis was facing criminal charges. Willis and his family stayed with Bernice and her husband for about a month after returning to Springfield then moved into 2030 East Monroe. Willis did not pay Bernice any rent while living at 2030 East Monroe. Willis and

Dorothy continued to live at 2030 East Monroe until Willis was arrested on drug charges about a year later.

To rebut Bernice's case, the government called several witnesses. Initially, the government called *Ola Mae Briggity*. Ms. Briggity is the daughter of Hattie Horton. Ms. Horton died on November 28, 1989 and Ms. Briggity was named executor of Ms. Horton's estate. During Ms. Briggity's inventory of Ms. Horton's estate, she found the contract for deed between Richard Gragg and Ms. Horton, and noted that $4,500 was still owed on the contract. Ms. Briggity hired an attorney, Mr. Theodis Lewis, to assist in the liquidation of Ms. Horton's estate including the contract for deed for 2030 East Monroe.

Mr. Lewis entered into negotiations with Attorney Carol Bellhouse Horstman to have the remaining $4,500 paid. Ms. Horstman represented Willis and Dorothy Gragg. A closing date on the contract for deed was set for September 19, 1990. On that date, Ms. Horstman, Willis and Dorothy Gragg were present in Mr. Lewis' office along with Ms. Briggity. Willis produced $4,500 in cash to pay the balance of the amount due on the contract for deed. Ms. Horstman was to hold the money in escrow pending Ms. Briggity's satisfaction of certain liens against the property. Apparently Ms. Horstman never disbursed the money to Ms. Briggity who reported Ms. Horstman to the Attorney Registration and Disciplinary Commission. Ms. Briggity testified that neither Richard Gragg nor Bernice Gragg participated in these events in any manner.

The government next called the *Honorable Theodis Lewis*. (Since acting as Ms. Briggity's attorney, Judge Lewis was appointed Associate Circuit Judge for the Seventh Judicial Circuit of Illinois.) Judge Lewis testified substantially to the same events as Ms. Briggity. Judge Lewis stated that during his participation in the negotiations he believed Willis and Dorothy Gragg were the purchasers of 2030 East Monroe. Judge Lewis dealt exclusively with Ms. Horstman who represented Willis and Dorothy Gragg. In connection with Judge Lewis' testimony, the government introduced several pieces of

correspondence between Judge Lewis and Ms. Horstman regarding the balance due on the contract for deed. This correspondence includes letters sent between Judge Lewis and Ms. Horstman and also letters from Ms. Horstman to Willis and Dorothy Gragg. The letters highlight the negotiations between the two parties regarding the remaining balance due of $4,500 on 2030 East Monroe.

The government next called *Dorothy Gragg*. She denied telling Federal Bureau of Investigation agents that during a trip to Minnesota sometime in the summer of 1988 her husband began discussing with Hattie Horton (Dorothy's grandmother) the purchase and sale of certain real property owned by Ms. Horton. Dorothy also denied telling FBI agents she made the original $6,000 downpayment on the real estate purchased from Ms. Horton. Dorothy further denied she had stated Willis hired Carol Bellhouse Horstman to represent him during the purchase of the real estate. Finally, Dorothy denied telling the FBI that she and Willis owned 2030 East Monroe and that Bernice Gragg had no ownership interest in the property.

The government received permission to treat Dorothy Gragg as a hostile witness, and proceeded to impeach her denials with statements she gave to FBI agents. Basically, Dorothy told the FBI everything she denied on the witness stand, i.e. Willis discussed buying the property from Ms. Horton in the summer of 1988 during a trip to Minnesota, Dorothy paid the $6,000 downpayment, Willis hired Attorney Horstman to assist in the purchase, and Bernice had no ownership rights in 2030 East Monroe.

The government also confronted Dorothy with a petition for dissolution of marriage and an amended petition for dissolution of marriage filed in the Circuit Court of the Seventh Judicial Circuit, Sangamon County, on August 17, 1989 and April 9, 1990 respectively. In the initial petition, Dorothy stated that she and Willis were purchasing 2030 East Monroe from her grandmother on a contract for deed and asked the Court to award that property to her. In the amended petition, Dorothy again stated she and Willis were purchasing 2030 East Monroe from her grandmother on a contract for deed; however, she asked the Court to award the property to Willis. These petitions were made under oath.

The government next called *Ronald Williams*. Williams pled guilty to conspiracy to distribute cocaine and agreed to cooperate with the government. Williams testified that he met Willis in late November 1991. Williams owned a construction business and Willis, who had just gotten out of jail, needed work. Williams hired Willis although as it turns out Willis never did any work. According to Williams, Willis did not actually want a job; he simply wanted an employer to issue him false paychecks to make it look like he had legitimate income. Williams agreed to carry Willis on his books as a phantom employee.

Williams further testified that in December 1991 Willis approached Williams about building a garage with an upstairs apartment at 2030 East Monroe. Williams and Willis met to discuss the garage. Williams agreed to build the garage and asked for a $3,000 downpayment. According to Williams, Willis made a phone call and a short while later Bernice Gragg came to Williams' office with a velvet bag containing $7,000 which Willis put towards the garage as a downpayment. Willis requested the construction contract be made out to his mother. Williams followed the request and Willis returned the contract to Williams with Bernice Gragg's signature. Bernice testified she had never seen the contract before and that her signature was in Willis' handwriting.

The footings for the garage were poured; however, that is as far as the construction went. Bad weather slowed progress on the garage and Willis' and Williams' subsequent arrests put a permanent hold on the project.

*Legal Standard*

There are two types of standing in a civil forfeiture action, statutory standing and Article III standing. *United States v. U.S. Currency, the Amount of $103,387.27*, 863 F.2d 555, 560 n. 10 (7th Cir.1988).

To contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III stand-

ing, otherwise there is no 'case or controversy.' *United States v. $38,000.00 in United States Currency,* 816 F.2d 1538, 1543 (11th Cir.1987). With respect to statutory standing, once the procedural rules of Rule C(6) are met, a claimant has standing to defend the forfeiture. *Id.*[1]

"A claimant in a forfeiture case has Article III standing if 'he has a legally cognizable interest in the property that will be injured if the property is forfeited to the government. It is this claim of injury that confers upon the claimant the requisite "case or controversy" standing to contest the forfeiture.'" *United States v. 105,800 Shares of Common Stock,* 830 F.Supp. 1101, 1115 (N.D.Ill.1993) (quoting *United States v. $38,000.00 in U.S. Currency,* 816 F.2d 1538, 1543–44 n. 12 (11th Cir.1987)). "Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it." *United States v. Accounts Nos. 3034504504 and 144–07143,* 971 F.2d 974, 985 (3rd Cir.1992), *cert. denied sub nom. Friko Corp. v. United States,* —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993) (citations omitted).

■ There is, of course, an exception to this general rule. "The courts have uniformly rejected standing claims put forward by . . . nominal or straw owners. Thus, even possession of legal title to the res may be insufficient to establish standing to contest the forfeiture." 1 David B. Smith, *Defense and Prosecution of Forfeiture Cases,* ¶ 9.04 at 9–62.8 (1994). Every Circuit which has addressed the issue has held that a claimant who has bare legal title to the res without having the authority to exercise dominion or control over the res does not have Article III standing to challenge the forfeiture of the res. *Accounts Nos. 3034504504 and 144–07143,* 971 F.2d at 985; *United States v. Liscum Dr., Dayton, Montgomery County,* 866 F.2d 213, 217 (6th Cir.1988); *United States v. One 1945 Douglas C–54 (DC–4)*

*Aircraft,* 604 F.2d 27, 28 (8th Cir.1979), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982); *United States v. Vacant Land,* 15 F.3d 128, 130 (9th Cir.1993); *United States v. A Single Family Residence,* 803 F.2d 625, 630 (11th Cir.1986). *United States v. Certain Real Property Located at River Rd.,* 839 F.Supp. 1, 2 (D.Me.1993) *aff'd* 23 F.3d 395 (1st Cir.1994). Furthermore, several district courts in the circuits which have not yet addressed the issue have followed the First, Third, Sixth, Eighth, Ninth and Eleventh Circuits' reasoning. *United States v. Ground Known as 2511 E. Fairmount Ave.,* 737 F.Supp. 878, 882 (D.Md.1990); *United States v. Premises and Real Property With Buildings, Appurtenances and Improvements at 500 Delaware Street, Tonawanda, New York,* 868 F.Supp. 513, 518 (W.D.N.Y. 1994); *United States v. 105,800 Shares of Common Stock,* 830 F.Supp. 1101, 1115–16 (N.D.Ill.1993).

■ Judge Scott from the Southern District of Florida succinctly stated the rationale behind the exception.

The rationale for the rule that bare legal title may be insufficient is based on a candid determination that things are often not what they appear to be, especially in the world of drug trafficking any [sic] other illegal operations. In brief, people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name. The criminal's need to hide his ownership of property is especially acute when the property itself is used in the illegal activity, such as when a high-speed boat is used to ferry contraband.

*United States v. One 1977 36 Foot Cigarette Ocean Racer,* 624 F.Supp. 290, 294–95 (S.D.Fla.1985). The government has the initial burden to establish a prima facie case that a claimant is merely a nominal owner. Once the government makes its showing, the burden shifts to the claimant to show he has

---

1. Since the Court finds Bernice does not have Article III standing it is not necessary for the Court to address the issue of statutory standing. The Court notes, however, that Bernice has satisfied the requirements of Rule C(6) of the Supplemental Rules For Certain Admiralty And Maritime Claims and therefore does have statutory standing. *See, U.S. Currency, the Amount of $103,387.27,* 863 F.2d at 558–59; *United States v. United States Currency Etc.,* 754 F.2d 208, 212–13 (7th Cir.1985).

exercised some type of dominion or control over the res. *United States v. Premises Known as 717 South Woodard Street,* 804 F.Supp. 716, 723 (E.D.Pa.1992), *aff'd in part, rev'd in part,* 2 F.3d 529 (3rd Cir.1993). Although the Seventh Circuit has yet to address the issue, the Court finds the Seventh Circuit will follow its sister Circuits and adopt the "nominal owner" exception when presented with the issue. Accordingly, that exception will be applied in this case.

### Analysis

■ The Court finds the government has established a prima facia case that Bernice Gragg was merely a nominal owner of 2030 East Monroe. The burden, therefore, shifts to Bernice to establish that she has exercised some type of dominion or control over the defendant property. Bernice fails to meet her burden. While Bernice was the legal title holder of 2030 East Monroe, she exercised no dominion or control over the property whatsoever. In sum, Bernice was simply a straw man for Willis who was attempting to shield his assets from forfeiture.

The Court comes to this conclusion because Bernice's and Richard's stories do not hold water. Richard claims that in the spring of 1989 he ran into financial trouble and Ms. Horton was threatening to foreclose. Richard's own records, however, indicate that at that time he was at least three months ahead on his payments. Furthermore, "crunching the numbers" leads one to the conclusion that Richard could not afford to pay his own mortgage, his monthly payment on the contract for deed, and purchase all the materials that were used to renovate 2030 East Monroe. Richard was receiving money from someone. When confronted with this fact on cross-examination, Richard was unable to satisfactorily explain where the excess money was coming from.

Bernice claims to have made two. $1,000 payments to Ms. Horton to bring Richard up to date on his payments. As the Court has previously noted, however, Richard was never behind on his payments. In fact, looking at Bernice's exhibit #8, when Richard stopped making payments in August of 1989, he was six months ahead of the payment schedule. These receipts show that on March 20, 1989 a $1,000 payment was made, on April 20, 1989 a $1,000 payment was made, in May 1989 a $500 payment was made, on June 14, 1989 a $1,000 payment was made, the next receipt is also dated June 14, 1989 showing a $500 payment being made, and on August 28, 1989 the last payment in the amount of $500 was paid. All these receipts state that payment was received from Richard Gragg. Richard testified that he quitclaimed the property to Bernice in October of 1989 because Bernice had made all the monthly payments since spring of 1989. Bernice testified to making only two payments of $1,000. Assuming Bernice made these payments in March and April of 1989, exhibit #8 indicates $1,000 payments were made in each of those months, there are still four more payments totaling $2,500 that are unaccounted for.

Furthermore, after Richard quitclaimed the property to Bernice, not a single payment was made on the property until Ola Mae Briggity and Judge Lewis began attempting to collect the balance due on the contract after Ms. Horton's death. And, at that time Willis and Dorothy paid off the balance of the contract, not Bernice. Judge Lewis sent his first letter regarding the unpaid balance on the contract on March 23, 1990. This letter was sent to Richard; however, it was answered by Willis' attorney. Both Ms. Briggity and Judge Lewis testified that at no time during the negotiations to settle the outstanding balance on the contract for deed did Bernice participate in any way. Rather, according to Ms. Briggity and Judge Lewis, Willis and Dorothy were the purchasers of 2030 East Monroe.

Obviously, either exhibit #8 is incorrect or Richard and Bernice are not telling the truth. This complete lack of corroboration between Richard's testimony, Bernice's testimony, and the documentary evidence produced by Bernice seriously undermines the credibility of both Richard and Bernice. The Court simply does not know whose story to believe; therefore, it does not believe either of them.

It is also interesting to note that while Richard testified he purchased 2030 East

Monroe so that he could renovate the property and then rent it out, the premises was never rented. Richard took possession of the property in October 1988. Richard testified that the renovation was completed within four to six months after taking possession. Willis did not move into the house at 2030 East Monroe until sometime in August or September 1989. Accordingly, the house sat empty, ready to rent from at least April to August 1989. Given Richard's financial troubles, and their timing, spring 1989, it would seem logical that Richard would attempt to rent the property as soon as possible. By the same token, if Bernice had been forced to take over the payments on the property in the spring of 1989 plus put $2,000 worth of materials into the building, one would think she would attempt to rent the house as soon as possible. Once again, Richard's and Bernice's actions do not track those of a true owner.

On top of this are Dorothy's statements in the petition for dissolution of marriage and the amended petition for dissolution of marriage. In these sworn documents, Dorothy states that she and Willis owned 2030 East Monroe. These statements, which can be used as substantive evidence, clearly refute Bernice's claim of ownership and bolster the government's argument that Bernice was simply a straw man for Willis. See F.R.E. 801(d)(1)(A). Dorothy's denials on the witness stand were utterly and completely impeached by her prior statements to the FBI. It is interesting to note that at the time of the trial Dorothy had a strong motive to change her story; she was in prison and her son was being cared for by Bernice Gragg. Accordingly, the only statements of Dorothy's the Court finds credible are those contained in the petitions for dissolution of marriage.

Finally, Bernice's total lack of involvement in the building of the new garage highlights her lack of control over the defendant property. At the time of Willis' arrest he was involved in a major addition to the defendant property. Bernice testified that she was not involved in the building of the new garage. It was Willis who decided to build the garage, Willis who had a construction contract drawn up, Willis who made the downpayment for the project and Willis who forged Bernice's signature on the construction contract. This incident demonstrates the fallacy of any argument that Bernice and not Willis owned 2030 East Monroe.

It is true that Bernice rented 2030 East Monroe after Willis was incarcerated for his federal offense. This fact does not change the Court's analysis. It makes perfect sense that after Willis was arrested, pleaded guilty and was incarcerated he could no longer use the defendant property or control it so he had his mother, his strawman (or straw woman as the case may be), rent the premises for him.

### Sua Sponte

■ Although neither party has addressed the issue, the Court feels compelled to discuss the impact of the Supreme Court's decision in *United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), on this case. In *Good Real Property,* the Supreme Court held that absent exigent circumstances the government could not seize real property in a civil forfeiture proceeding without providing the owner pre-seizure notice and a meaningful opportunity to be heard. *Id.* at ——, 114 S.Ct. at 505. Absent exigent circumstances, failure to provide an owner with pre-seizure notice and a hearing violates the owner's procedural due process rights. *Id.* "To establish exigent circumstances, the Government must show that less restrictive measures—*i.e.,* a *lis pendens,* restraining order, or bond—would not suffice to protect the government's interests in preventing the sale, destruction, or continued unlawful use of the real property." *Id.*

■ Although the seizure of the defendant property in this case occurred prior to the Supreme Court's decision in *Good Real Property,* the rule of law announced in *Good Real Property* is applicable to this case. *Good Real Property* applied a rule of federal law to the litigants in that case. Under the Supreme Court's retroactivity jurisprudence, *Good Real Property* must be applied retroactively to all cases pending on direct review or not yet filed at the time *Good Real Property* was announced. *Harper v. Virginia Dept. of*

*Taxation,* — U.S. —, —, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) ("[w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."); *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991); *United States v. Real Property at 20832 Big Rock Drive,* 51 F.3d 1402 (9th Cir.1995) (*Good Real Property* applies retroactively); *United States v. One Parcel of Real Property,* 27 F.3d 327 (8th Cir.1994) (same).

■ In the instant case, no showing of exigency has been made. Therefore, the defendant property should not have been seized without pre-seizure notice and an opportunity for the owner to be heard. In a case almost identical to the case at bar, the Sixth Circuit held that the failure to provide pre-seizure notice and hearing required reversal of the district court's determination that the claimant was merely a nominal owner who lacked standing to challenge the forfeiture and therefore the forfeiture should be allowed. *United States v. Certain Real Property Located at 16510 Ashton, Detroit, Wayne County, Michigan,* 47 F.3d 1465, 1472 (6th Cir.1995). According to the majority, the claimant, who was the legal title holder but whom the district court found was merely a straw man for a drug dealer, was

> situated in a Catch–22: as [an] owner[ ] of real property, [he has] a Due Process right recognized by the Supreme Court to a pre-seizure hearing; yet, being unable to show more than legal title, [he] lack[s] standing under our prior decisions to challenge the forfeiture and receive the hearing to which Due Process entitles [him].

*Id.* The dissent, obviously, disagreed. "The very issue here is not whether the *owner* gets notice and an opportunity for a predeprivation hearing. Of course he does. The question is whether [the claimant] has demonstrated that he is, in fact, the owner, rather than merely a straw man fronting for [a drug dealer]." *Id.* at 1475 (emphasis in original).

This Court must agree with the dissent in *Real Property.* The whole purpose of the straw man exception to the general rule that a record title owner has standing to challenge a forfeiture proceeding is the federal courts' realization that things are not always what they seem, especially in the world of drug dealers. *One 1977 36 Foot Cigarette Ocean Racer,* 624 F.Supp. at 294–95. In essence, in this line of cases courts are saying to claimants, "although you have a piece of paper saying you are the owner, the truth of the matter is your ownership is a sham to protect a drug dealer's property from forfeiture and we will not be fooled by the sham." The result of this reasoning is that the straw man has no true ownership interest in the defendant property. Without some type of valid property interest in a particular piece of property, a person has no due process rights attached to the property. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985).

Accordingly, once this Court determined Bernice had no true ownership interest in 2030 East Monroe the inevitable result of that determination was that Bernice had no due process rights attached to the property. Bernice, therefore, had no due process rights violated by the government's seizure of the property without pre-seizure notice or hearing.[2]

**2.** Even if the Court were to find Bernice's due process rights had been violated, dismissal of the forfeiture need not automatically follow. A split in the Circuits has developed regarding the proper remedy for due process violations in cases where an owner has not been given pre-seizure notice and hearing before his property is seized. The Ninth and Second Circuits have held that dismissal of the forfeiture is not warranted. *Real Property,* 51 F.3d at 1406; *United States v. Prem-*ises *and Real Property at 4492 South Livonia Road,* 889 F.2d 1258, 1265–66 (2nd Cir.1989). The Eighth and now apparently the Sixth Circuits have held that failure to provide pre-seizure notice and hearing mandates dismissal of the forfeiture case. *One Parcel of Real Property,* 27 F.3d at 330; *Certain Real Property,* 47 F.3d at 1472. Because the Court determines Bernice's procedural due process rights have not been violated, this issue need not be resolved.

*Ergo,* Claimant Bernice Gragg's claim is dismissed for lack of Article III standing.

Since no claim against the property survives, the forfeiture of 2030 East Monroe is to proceed.