UNITED STATES of America, Plaintiff,

v.

ONE 1997 E35 FORD VAN, VIN 1FBJS31L3VHB70844, All Funds in First National Bank of Chicago Account No. 12310153, All Funds in Midland Federal Savings & Loan Account No. 001093002113, All Funds in First National Bank of Evergreen Park Account No. 1412446, All Funds in Standard Bank & Trust Account No. 5580349268, All Funds in Standard Bank & Trust Account No. 239328806, All Funds in Standard Bank & Trust Safe Deposit Box No. 207, All Funds in Standard Bank & Trust Safe Deposit Box No. 4019, All Funds in First National Bank of Chicago Account No. 8060700, All Funds in LaSalle Bank, F.S.B. Account No. 022034532, Real Property Known as 9229 South Thomas, Bridgeview, Illinois, Defendants.

No. 98 C 3548.

United States District Court, N.D. Illinois, Eastern Division.

May 12, 1999.

William H. Theis, Shellow, Shellow & Glynn, Milwaukee, Wisconsin, for claimant Quranic Literacy Institute.

Matthew J. Piers, Jonathan A. Rothstein, Dana Sukenik, Gessler, Hughes & Socol, Ltd., Chicago, Illinois, for claimant Muhammad Salah.

John S. Graettinger, Chicago, Illinois, for claimants Maryan Azita Salah and her minor children.

Scott Lassar, United States Attorney; Joseph M. Ferguson, Assistant United States Attorney, Chicago, Illinois, for the United States Government.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District Judge.

The United States government filed this civil forfeiture action seeking to forfeit all funds contained in seven bank accounts and two safe deposit boxes on the theory that these funds were transferred to financial institutions within the United States from abroad with the intent to support the international terrorist activities of the HAMAS organization in violation of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956. These activities allegedly include acts of extortion, kidnaping, and murder against the State of Israel and its citizens as part of HAMAS' alleged campaign to force Israel to cede physical and political control over the lands comprising Israel and the occupied territories of the West Bank and Gaza Strip. The government also seeks to forfeit a residence and one Ford Van because they were allegedly purchased with the illicit funds. The government alleges that the property is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A) which authorizes it to forfeit any property "involved in a transaction or attempted transaction in violation of section 1956 or 1957 ... or any property traceable to such property."

Muhammad Salah, his wife Maryam Azita Salah (on behalf of herself and that of her children), and the Quranic Literacy Institute ("QLI") have each filed verified claims to the defendant property. Salah and his wife direct their claims to Standard Bank & Trust account nos. 5580349268 and 2393228806, and safe deposit box nos. 207 and 4019; First National Bank of Chicago account no. 8060700; LaSalle bank, F.S.B. account no. 022034532; and their residence at 9229 South Thomas, Bridgeview Illinois. The assets seized from QLI include the funds contained in First National Bank of Chicago account no. 12310153; Midland Federal Savings & Loan account no. 0010930021133; First National Bank of Evergreen Park account no. 1412446; and one 1997 E35 Ford Van, VIN No. 1FBJS31L3VHB70844. The claimants have each moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).

For the following reasons, we find that the complaint alleges a reasonable basis for the government's belief that the funds are tainted because they were transferred in violation of Section 1956(a)(2). We also find that the complaint establishes a reasonable basis for the government's belief that the Ford Van and residence are forfeitable because they are traceable to funds that are forfeitable pursuant to Section 1956(a)(2) and Section 981. The motions are granted to the extent the complaint seeks to forfeit the Ford Van and residence based on a violation of Section 1957 because the complaint does not allege that the funds used to purchase these assets were derived from "specified unlawful activity." *See United States v. Lovett,* 964

F.2d 1029, 1041 (10th Cir.) (holding that property forfeitable pursuant to Section 1957 and Section 981 must, in fact, be derived from "specified unlawful activity."), *cert. denied,* 506 U.S. 857, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992).

## THE ALLEGATIONS

The government has set forth the events relevant to this litigation in its verified complaint and the accompanying affidavit of Robert Wright, a Special Agent of the Federal Bureau of Investigation ("FBI"). Wright is assigned to the Chicago Division Counter–Terrorism Task Force and, in that capacity, has become familiar with the techniques international terrorist organizations use to launder money in and out of the United States in support of extortionate terrorist and paramilitary activities and operations in the United States and abroad. The Chicago Task Force has been conducting an investigation involving the transfer of money from Europe and the Middle East to a network of individuals and organizations in the United States, including Muhammad Salah, Maryam Azita Salah, and QLI. The allegations of facts allegedly uncovered by this investigation are set forth in the Wright Affidavit. We briefly summarize these allegations below.

First, an opening caveat. The events detailed in the Wright Affidavit are merely assertions of what the government believes the evidence at trial will establish. The Wright Affidavit, to be sure, contains serious allegations of criminal wrongdoing on the part of both HAMAS and Salah. We acknowledge and remind the reader that they are nothing more than allegations. The government has yet to produce any evidence in support of these allegations and Salah has steadfastly denied their truth. While the law requires this court to presume that these allegations are true and to view them in a light most favorable to the government for purposes of the instant motions, none of the statements set forth in this opinion should be construed as a factual finding of this court. With this in mind, we now turn to the allegations of the forfeiture complaint.

On January 25, 1993, Mohamad Salah ("Salah"), a naturalized American citizen and Chicago area resident, was arrested by the Israeli government while in Israel allegedly to promote the activities of the HAMAS organization. In January 1995, Salah pled guilty in an Israeli military court to being a member of HAMAS and to channeling funds to HAMAS, including funds transferred through one of the subject bank accounts that he held jointly with his wife, Maryam Azita Salah. Salah was sentenced to a term of five years imprisonment. On February 10, 1995, the United States Treasury Department's Office of Foreign Asset Control, having reason to believe that Salah acted on behalf of HAMAS, which President Clinton has designated in Executive Order 12947 as a terrorist organization threatening to disrupt the Middle East Peace Process, froze all known Salah bank accounts but on a monthly basis licensed Mrs. Salah to withdraw a living stipend. Also, on July 27, 1995, the Department added Salah to the list of Specially Designated Terrorists because of his alleged participation in terrorist activities in the Middle East.

The government claims that after his arrest Salah made a series of statements to Israeli authorities detailing his activities in the United States and abroad as a HAMAS military operative. These statements comprise a significant portion of the allegations set forth against Salah in the Wright Affidavit. Salah allegedly stated that his involvement with HAMAS began approximately in 1988. He divulged that he recruited and trained, domestically and abroad, new candidates for membership in HAMAS military cells that performed terrorist acts in Israel and the Occupied Territories. These recruiting activities allegedly included, among other things, conducting interviews and background checks and identifying and classifying prospective candidates on the basis of expertise and knowledge in chemicals, explosives, and the construction of terrorist devices that might be used in HAMAS military operations in Israel and else-

where. Salah allegedly admitted that these training activities included mixing poisons, developing chemical weapons, and preparing remote control explosive devices. The government alleges that Salah also admitted acting as a financial conduit and directly financing domestic and international travel and terrorism training for new HAMAS members.

Further, Salah allegedly stated that he took extended trips within the United States and abroad on behalf of HAMAS. For example, in August and September 1992, Salah went on a sixteen day trip to Israel and the Occupied Territories. During this trip, Salah funneled approximately $100,000 to an alleged HAMAS operative, Salah Al–Arouri, which, according to both Salah and Al–Arouri, was used to purchase weapons. Al–Arouri allegedly admitted to Israeli officials that he gave an individual named Musa Dudin approximately $45,000 of the money he received from Salah so that Dudin could purchase weapons in September 1992. Al–Arouri further related that Dudin purchased the weapons as planned and that these weapons were subsequently used in terrorist attacks, including a suicide attack resulting in the murder of an Israeli soldier in Hebron in October 1992. The government alleges that at least half of the funds Salah gave to Al–Arouri originated from the Salahs' La-Salle Bank account no. 022034532.

The government also alleges that, in January 1993, at the request of Mousa Abu Marzook, the leader of HAMAS, Salah traveled to Israel on behalf of HAMAS. This trip allegedly was designed to help reorganize and restaff several military cells throughout Israel after a series of terrorist acts for which HAMAS claimed credit prompted the Israeli government to deport 415 HAMAS operatives from Israel and the Occupied Territories in December 1992. To that end, Abu Marzook allegedly instructed Salah to distribute a specified sum of money to each military cell, to meet with other HAMAS operatives to coordinate responsive terrorist attacks against Israel, and to restaff the decimated military infrastructure by placing certain individuals into leadership positions in various mosques and units. This trip was unexpectedly cut short when Israeli authorities arrested Salah on January 25, 1993. At the time of his arrest, Israeli authorities recovered from Salah $97,400 and extensive notes he had compiled from his meetings with over forty HAMAS operatives and contacts in Israel and the Occupied Territories during the preceding eleven days.

As funding for this trip, Salah allegedly admitted to Israeli authorities that he provided Abu Marzook with the account number to his LaSalle account so that Abu Marzook could wire him the funds to be distributed to the HAMAS operatives in the Middle East. Bank records also reveal that on December 29, 1992, Ismail Selim Elbarasse, an alleged HAMAS operative in the United States, wire transferred $300,000 to the LaSalle account. The Elbarasse wire transfer originated from an account at the First American Bank of McLean, Virginia, which Elbarasse held jointly with Abu Marzook. Bank records also indicate that in early January 1993 Salah withdrew a significant portion of the $300,000 that Elbarasse had wired into his account. Within days of this withdrawal, Elbarasse wire transferred $135,000 into the LaSalle Bank account and, five days later, wire transferred an additional $300,000. During this same period, Nassar Al–Khatib, an alleged supporter and financial backer of HAMAS and a close associate of Abu Marzook, wire transferred $50,000 into the LaSalle account and $200,000 into Standard Bank & Trust account no. 2393228806.

For at least the twenty-five month period preceding his arrest in Israel, Salah was associated with and claimed to be an employee of QLI. QLI is based in Oak Lawn, Illinois and represents itself as a not-for-profit research institute devoted to the translation and publication of sacred Islamic texts. The government has obtained an employment verification letter that QLI issued for Salah to the Standard

Bank & Trust Company of Evergreen Park, Illinois. The letter, printed on QLI letterhead and signed by QLI Corporate Secretary and Trustee Amer Haleem, states that Salah began working for QLI as a computer analyst on January 1, 1991. QLI provided this letter to Standard Bank & Trust to enable Salah to obtain a mortgage loan in excess of $100,000 for his residence in Bridgeview, Illinois. Additionally, when Salah opened his account with the First National Bank of Chicago, QLI Treasurer Abraham Abusharif orally verified that Salah was employed at QLI. The government alleges that QLI and Salah falsely represented to the banks the true nature of their relationship to provide a cover for Salah who was a high-level HAMAS military operative.

The government also alleges that QLI and individuals and entities related to QLI likely financed Salah's HAMAS-related expenditures since 1991 through structured transactions designed to conceal QLI as the source. For example, in October 1991, QLI President Ahmad Zaki Hameed transferred $18,000 to Salah through three $6,000 checks drawn from his personal bank account. Salah also received $40,500 in the form of five cashier's checks each in the amount of $8, 100 from Linda Abusharif, the sister of QLI Treasurer Abraham Abusharif. Bank records reflect that Salah countersigned these checks and deposited them in his LaSalle Bank account. The government further alleges that QLI entered into a business transaction involving the purchase, lease, and sale of real property in Woodridge, Illinois. The government claims that the money used to finance this transaction was transferred to the United States for the purpose of supporting the terrorist activities of HAMAS. This land deal, which was structured so as to conceal QLI, yielded in the first year $110,000, a sum nearly equal to the amount an overseas entity, Faisal Financial, transmitted to Salah in 1992.

In November 1997, Salah was released from an Israeli prison and returned to the United States. On June 9, 1998, the government filed a verified complaint of forfeiture and resulting warrants of seizure and monition were executed for seven bank accounts, two bank safe deposit boxes, and one 1997 E35 Ford Van variously owned or controlled by the Salahs or QLI. The bank accounts and safe deposit boxes include Standard Bank & Trust account nos. 5580349268 and 2393228806, and safe deposit box nos. 207 and 4019; First National Bank of Chicago account nos. 8660700 and 12310153; LaSalle Bank, F.S.B. account no. 022034532; Midland Federal Savings and Loan account no. 0010930021133; and First National Bank of Evergreen account no. 1412446. Also, a warrant for arrest in rem was executed for the Salahs' residence located at 9229 South Thomas, Bridgeview, Illinois. Salah, Mrs. Salah (on behalf of herself and her children), and QLI then each filed verified claims to the property. On October 19, 1998, each claimant moved to dismiss the complaint.

### LEGAL STANDARD

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In deciding a motion to dismiss, the court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.* 113 F.3d 645, 648 (7th Cir.1997). At the same time, the court should not ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law. *LeBlang Motors, Ltd. v. Subaru,* 148 F.3d 680, 690 (7th Cir.1998). The court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

▆ When, as here, the government files a verified complaint for forfeiture in rem, the pleading standard is more exacting. The government must go beyond the simple notice pleading required in ordinary civil cases under Federal Rule of Civil Procedure 8(a) and state with specificity the factual basis of its claim. Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims provides that a civil forfeiture complaint must "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R.Civ.P. Supplemental Rule E(2)(a). By requiring that the complaint set forth in detail the circumstances supporting the government's forfeiture of the property, Rule E(2)(a) ensures that the claimants will be able "to commence an investigation of the facts and to respond with more than a general denial to the averments in the complaint." *United States v. Funds in the Amount of $9,800*, 952 F.Supp. 1254, 1259 (N.D.Ill.1996).

▆ The particularity requirement "is not merely a procedural technicality, but is, instead, a significant legal rule designed to curb excesses of government power and afford property owners some protection from the harshness of a forfeiture's attendant sanctions." *United States v. 384–390 West Broadway*, 964 F.2d 1244, 1248 (1st Cir.1992) (internal quotations and citation omitted). Civil forfeiture has withstood a recent chorus of criticism, *see* Henry Hyde, *Forfeiting Our Property Rights: Is Your Property Safe From Seizure?* (1995); Eric Blumenson & Eva Nilsen, *Policing for Profit: The Drug War's Hidden Economic Agenda*, 65 U.Chi.L.Rev. 35 (1998); Stephen H. McClain, Note, *Running the Gauntlet: An Assessment of the Double Jeopardy Implications of Criminally Prosecuting Drug Offenders and Pursuing Civil Forfeiture of Related Assets Under 21 U.S.C. § 881(A)(4), (6) and (7)*, 70 Notre Dame L.Rev. 941 (1995), and Rule E(2)(a) is designed in part to avoid the due process problems associated with the government holding property to which it has no legitimate claim. *United States v. Daccarett* 6 F.3d 37, 47 (2d Cir.1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994).

▆ The heightened pleading standard of Rule E(2)(a) requires the government to do more than make "wholly conclusory allegations" that the assets are tainted. *United States v. $9,800*, 952 F.Supp. at 1259. The government must plead facts sufficient to support a reasonable belief that the government can demonstrate probable cause for finding the property tainted. *United States v. $87,-060.00*, 23 F.3d 1352, 1353 (8th Cir.1994) (complaint "simply must establish a reasonable belief that the government can show probable cause for forfeiture at trial."). The government is not required to meet its ultimate burden of establishing probable cause for forfeiture at the pleading stage. "While the probable cause which the government must show at trial is a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion, for purposes of the complaint the allegations need only set forth a reasonable basis for believing that the property is subject to forfeiture." *United States v. $9,800*, 952 F.Supp. at 1260 (internal quotations omitted).

▆ The district court must necessarily assess the sufficiency of the forfeiture complaint with an eye toward the probable cause standard that the government must satisfy at trial. The government has the initial burden of establishing probable cause to believe that the property is subject to forfeiture. *United States v. All Assets and Equip. of West Side Bldg. Corp.*, 58 F.3d 1181, 1188 (7th Cir.1995). The government must show under the totality of the circumstances "a nexus," as compared to a "substantial connection," between the property and the illegal activity that is more than incidental or fortuitous. *Id.* at 1189 n. 13. The government

need not establish a criminal violation because probable cause requires only a probability or substantial chance of such activity. *United States v. 6250 Ledge Rd.*, 943 F.2d 721, 725 (7th Cir.1991). If the government establishes probable cause, the burden then shifts to the claimant to show by a preponderance of the evidence that the property is not subject to forfeiture. *All Assets*, 58 F.3d at 1189. If the claimant fails, the government's probable cause showing alone will support a judgment of forfeiture. *Id.*

## DISCUSSION

The government seeks to forfeit the defendant funds because they were involved in a violation of the money laundering statute, 18 U.S.C. § 1956(a)(2), and to forfeit the residence and Ford Van as assets traceable to these funds. Section 1956(a)(2)(A) is violated by

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States ... with the intent to promote the carrying on of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(A). This provision is distinguishable from Section 1956(a)(1) because it does not require proof that the funds were derived from specified unlawful activity and that the offender, knowing the funds are tainted, engaged in a "financial transaction" with the funds. *United States v. Piervinanzi*, 23 F.3d 670, 679–80 (2d Cir.), *cert. denied*, 513 U.S. 900, 115 S.Ct. 259, 130 L.Ed.2d 179 (1994). Liability attaches under Section 1956(a)(2)(A) for transporting, transmitting, or transferring funds overseas, even if those funds were lawfully derived, if the intent was to promote the carrying on of specified unlawful activity. The statute defines "specified unlawful activity," in part, as "an offense against a foreign nation involving ... murder, kidnaping, robbery, extortion, or destruction of property by means of explo-

sive or fire." 18 U.S.C. § 1956(c)(7)(B)(ii). In this case, the government seeks to forfeit the funds and the property derived therefrom because the funds allegedly were transferred into the United States with the intent of supporting HAMAS' alleged campaign of extortion, kidnaping, and murder against Israel and its citizens.

The claimants seek to dismiss the complaint on several grounds ranging from matters of pleading to whether the attempted forfeiture comports with the Constitution. The claimants principally argue that the funds contained in the bank accounts are not forfeitable because the complaint fails to establish probable cause that they were transferred into the United States with the intent to promote the carrying on of specified unlawful activity within the meaning of Section 1956(a)(2)(A). It follows, the argument continues, that neither the Salahs' residence nor the Ford Van are forfeitable because they were not derived from funds subject to forfeiture under 18 U.S.C. § 981. The Salahs also argue that this action should be dismissed because it is untimely and because the prehearing seizures violate their procedural due process rights. Finally, Mrs. Salah claims that she and her children are innocent owners under 18 U.S.C. § 981(a)(2) and that the attempted forfeiture violates the Excessive Fines Clause of the Eight Amendment. We address each of these arguments in turn.

## I. The Complaint Alleges a Reasonable Basis for Believing that the Salahs' Assets are Tainted.

The Salahs first seek to dismiss the complaint on the ground that the complaint does not establish probable cause that the funds were involved in a financial transaction in violation of Section 1956(a)(2)(A). More specifically, the Salahs argue that for each transfer outlined in the complaint the government has either failed to allege probable cause that the funds were transferred into the United States from abroad or probable cause that

such a transfer took place with the intent that the funds be used to promote the carrying on of specified unlawful activity. Before addressing whether the government has satisfied its pleading burden on each of these elements, we pause to note that the Salahs, like QLI, misapprehend the government's burden at this stage of the litigation. As noted above, the government need not establish probable cause but only a reasonable basis for its belief that the property is subject to forfeiture. *United States v. $9,800*, 952 F.Supp. at 1260. Measured against this standard, we find that the complaint sufficiently alleges a nexus between the funds and a violation of Section 1956(a)(2)(A).

## A. The Complaint Alleges that the Salahs' Funds are Derived From a Foreign Source.

The government seeks to forfeit the funds in Standard Bank & Trust account nos. 5580349268 and 2393228806, and safe deposit box nos. 207 and 44019; First National Bank of Chicago account no. 8060700; and LaSalle Bank, F.S.B. account no. 022034532. Because it is the money in these accounts that is subject to forfeiture, the government must do more than simply show that the accounts were involved in a financial transaction that violates the money laundering statute. *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir.1992). This is because "[a]n 'account' is a name, a routing device like the address of a building; the money is the 'property.' " *Id.* Acknowledging its burden, the government claims that it can trace the funds in these accounts from international sources. The Salahs concede, and we think correctly, that the government has satisfied its burden with respect to the $107,000 that Faisal Financial of Geneva, Switzerland deposited in First National Bank of Chicago account no. 8060700 through "a series of three substantial overseas wire transfers." (Aff.¶ 31).

The Salahs' principal challenge is that the complaint fails to allege that many of the wire transfers into their accounts in December 1992 and January 1993 originated from outside the United States. A total of $985,000 was wire transferred into the Salahs' accounts during this period, $735,000 of which was deposited into the Salahs' LaSalle Bank account. The $735,000 was deposited through three wire transfers from the First American Bank of McLean, Virginia account of Ismail Selim Elbarasse, who, according to Salah, is a HAMAS operative in the United States, and Mousa Abu Marzook, the leader of HAMAS. The first of these transfers occurred on December 29, 1992 when Elbarasse wire transferred $300,000 into the LaSalle Bank account. Just prior to this transfer there was a substantial influx of money into the First American Bank account. On December 23, 1992, an individual named Gazi Abu Samah wire transferred $99,985 and, later that same day, Faisal Financial wired $200,000 into the account. These transfers were followed with a December 29, 1992 wire transfer of $73,475.77 from Dubai, United Arab Emirates.

The government contends that the funds deposited in the First American Bank account originated from international sources and were ultimately transferred to the Salahs' LaSalle account. The issue then becomes whether the complaint alleges that the three transfers into the First American Bank account were derived from foreign sources. Of these transfers, the Salahs regard only the third transfer from Dubai, United Arab Emirate as coming from a foreign source. With respect to the $200,000 transfer from Faisal Financial, the Salahs complain that there is no description of Faisal Financial, how it is organized, where it does business, what type business it does, or where it maintains accounts. While this information may play a role in the ultimate resolution of this case, the complaint need not allege this information to establish that Faisal Financial transferred the money from outside the United States. The complaint alleges that the $200,000 wire transferred "from Faisal Financial of Geneva, Switzerland" was part of the substantial stream of money flowing into the Virginia account "from

international sources." (Aff.¶ 48). This is sufficient to satisfy the international transfer element.

■■■ As to the first transfer into the Virginia account, the complaint alleges that "[o]n December 23, 1992, $99,985 was wire transferred into the account by an individual named Gazi Abu Samah from an as yet unspecified source." (*Id.*). The Salahs argue that the phrase "from an as yet unspecified source" establishes that the government cannot satisfy the international transfer element because it does not know the source of these funds. The government counters that the phrase does not mean that the source of the funds was not international, only that the specific place of foreign origin is still unknown. The government explains that a wire transfer from abroad typically enters the United States through a foreign clearing house account of a major domestic bank—here, a major New York Bank—before it reaches its final destination—in this case, McClean Virginia. Although the records received by the destination bank may indicate that the wired funds went through a foreign clearing house of a domestic bank and thus came from an international source, further investigation is needed to pinpoint the exact foreign source.

While this may be true, the complaint is bare of any allegations that the $99,985 deposited in the Virginia account by Gazi Abu Samah went through the clearing house of a "major New York Bank" before it reached its final destination in Virginia. This court is limited to the allegations of the complaint and the government cannot supplement these allegations by raising additional facts in its brief. *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1057 (7th Cir.1988). Therefore, we must look solely to the allegations of the complaint in determining whether the $99,985 Gazi Abu Samah deposited in the Virginia account was transferred from outside the United States. These allegations establish that, after Elbarasse wire transferred $300,000 into the LaSalle Bank account on December 29, 1992, he transferred $135,000 on January 20, 1993 and $300,000 on January 25, 1993 into the LaSalle account. Before the January 20, 1993 transfer, the First American Bank of McLean Virginia account was infused with $99,985 from Gazi Abu Samah on January 4, 1993 and, three days before the January 25, 1993 transfer, $665,000 from Faisal Financial.

With respect to the $99,985 that Gazi Abu Samah transferred into the First American Bank account on January 4, 1993, the government alleges that "[b]ank records for the First American Bank of Virginia ... show a further influx of overseas money just prior to th[e] second round of wire transfers to the Salahs' LaSalle Bank account." (Aff.¶ 52). This allegation not only establishes that the second transfer of $99,985 by Gazi Abu Samah was from a foreign source, but, when read in conjunction with the other allegations of the complaint, also supports the inference that the first transfer of $99,985 was likewise from a foreign source. Gazi Abu Samah made both transfers for the same amount of $99,985 within 14 days of one another. The parallels between these two transfers make it reasonable to infer that the first deposit of $99,985 on December 23, 1992 was transferred from outside the United States. We also find that the $665,000 Faisal deposited into the First American Bank account on January 22, 1993, like the $200,000 Faisal Financial wired into the account on December 23, 1992, was derived from an international source.

The remaining $250,000 transferred into the Salahs' accounts during December 1992 and January 1993 came from the Central Fidelity of Virginia account of Nasser Al-Khatib. On January 21, 1993, Al-Khatib deposited $30,000 into the Salahs' Standard Bank & Trust account no. 2393228806 and $50,000 into the Salahs' LaSalle Bank account. These transfers were followed the next day with a deposit of $170,000 into the Standard Bank & Trust account. The Salahs argue that this

court should release these funds because the complaint fails to allege specifically that they were derived from a foreign source. While conceding that the complaint does not allege direct proof that these funds came from an overseas source (Mem.Opp. at p. 21), the government argues that it is reasonable to infer that the funds Al–Khatib transferred were derived from a foreign origin like the other funds wired to Salah during December 1992 and January 1993. The Salahs claim that such an inference would be "a leap of faith based on a series of speculations." (Reply Supp. Mot. Dismiss at 8).

Construing the allegations of the complaint liberally, as we must, we find that the complaint raises a reasonable inference that the $250,000 Al–Khatib transferred into the Salahs' accounts was derived from a foreign source. Al–Khatib allegedly is an acknowledged supporter of HAMAS and a close associate of Abu Marzook. The government alleges that Al–Khatib has admitted to the FBI that he has donated money to HAMAS and that, before leaving the United States in June 1993, he served as Abu Marzook's secretary. In that capacity, Al–Khatib had access to and power of signature over some of Abu Marzook's accounts and made financial transactions on behalf of Abu Marzook, including a transfer to Salah just prior to Salah's August 1992 trip to the Middle East. Salah allegedly admitted to Israeli authorities that he made this trip on behalf of HAMAS, carrying out specific orders from Abu Marzook that included the order to distribute $790,000 to HAMAS cells engaged in military activities. The government claims that Salah also admitted that he provided Abu Marzook with the account number to his LaSalle account so that Abu Marzook could wire him the funds he was to distribute.

The Al–Khatib transfers occurred during the same time that Elbarasse, also a close associate of Abu Marzook, was transferring funds on behalf of Abu Marzook from another Virginia bank. The Al–Khatib transfers all occurred between January 20 and 25, 1993, during which Elbarasse

transferred an additional $435,000 into the Salahs' LaSalle account. Moreover, both transfers occurred immediately after Salah instructed his wife to transfer $200,000 to an account held in the name of Rihbe Abdel Rahman so that the funds could be transferred to him in Israel, thereby successfully opening a channel for money to flow from his Chicago accounts to the Middle East. It is logical to infer from these circumstances that Al–Khatib, like Elbarasse, was transferring money on behalf of Abu Marzook. The Elbarasse transferred funds, which the government has alleged were derived from a foreign source, were also directed at the same LaSalle account as some of the transfers from Al–Khatib. Based on these parallels, we find that it is reasonable to infer that the funds Al–Khatib transferred on behalf of Abu Marzook originated from outside the United States.

■ The outstanding mortgage on the Salahs' residence was settled with a portion of the $985,000 wire transferred into the Salahs' accounts between December 29, 1992 and January 25, 1993. On February 1, 1993, Mrs. Salah withdrew $723,-541.18 of the $985,000 and deposited $717,-041.18 into a new account, Standard Bank & Trust no. 56002850–0. This sum reasonably approximates what would have remained of the $985,000 after Salah was wired $200,000 while in Israel on HAMAS business. Bank records show that Mrs. Salah then began to withdraw substantial amounts of money from the account. On April 2, 1993, Mrs. Salah withdrew $4,500 and signed a lease for Standard Bank & Trust safe deposit box no. 207. On April 6, 1993, Mrs. Salah transferred $97,067.93 from the account to pay the outstanding balance on the Salahs' residential mortgage. Because it is reasonable to infer that the amounts placed in the new account and safe deposit box are the same foreign-derived funds transferred into the Salahs' old accounts, the residence may be forfeitable as property traceable to funds transferred in violation of Section 1956(a)(2)(A).

What remained of the foreign-derived funds was transferred into the Salahs' other bank accounts. On February 10, 1995, the Office of Foreign Asset Control froze all of the Salahs' accounts including Standard Bank & Trust account no. 56002850–0, the new account Mrs. Salah opened on February 1, 1993 with $723,541.18. After the freeze order, Standard Bank & Trust transferred these funds into a new account, Standard Bank & Trust Account no. 560249500–3. On March 31, 1995, those funds, totaling $233,973 were transferred to a Standard Bank & Trust certificate of deposit, the remainder of which is held in Standard Bank & Trust account no. 5580349268. Mrs. Salah has withdrawn from the certificate of deposit a living stipend that she deposited in Standard Bank & Trust account no. 239328806. These funds are therefore traceable to the foreign-derived funds. The complaint also raises a reasonable inference that Standard Bank & Trust safe deposit box no. 4019 contains a portion of the $30,000 Faisal Financial transferred on July 3, 1992.

**B. The Complaint Alleges that the Salahs' Funds were Transferred with the Intent to Promote the Carrying on of Specified Unlawful Activity.**

 The Salahs next argue that the complaint fails to establish a reasonable basis for the government's belief that the foreign-derived funds were transferred with the intent of promoting the carrying on of specified unlawful activity. The complaint alleges that in January 1993, at the request of Abu Marzook, Salah traveled to Israel to help reorganize and restaff several HAMAS military cells after the Israeli government deported 415 HAMAS operatives. Abu Marzook allegedly instructed Salah to distribute to HAMAS operatives approximately $780,000 that Abu Marzook would wire to Salah's domestic bank accounts. The government alleges that, according to Salah, Abu Marzook directed Salah to distribute certain amounts to specific military cells throughout Israel and the Occupied Territories, with the remainder to be distributed according to Salah's assessment of the military and general requirements of HAMAS. Abu Marzook also ordered Salah to place certain individuals into leadership positions in various units to replace those who were deported and to meet with other operatives to coordinate responsive terrorists attacks against Israel.

The past activities of HAMAS leave little doubt as to what these terrorist attacks may have looked like. In October 1995, the United States filed an extradition action against Abu Marzook based on criminal charges pending in Israel for murder, attempted murder, and conspiracy. These charges stemmed from terrorist attacks allegedly sponsored by HAMAS on civilians in Israel and the Occupied Territories between July 1990 and October 1994. These ten terrorist attacks killed over 40 Israeli citizens, wounded scores of Israeli soldiers and citizens, and resulted in the kidnaping of several civilians. The United States District Court for the Southern District of New York found probable cause to believe that HAMAS was responsible for these attacks. *In re Extradition of Marzook*, 924 F.Supp. 565, 579–585 (S.D.N.Y. 1996). These incidents include the bombing of two passenger buses in April 1994 that together killed 14 people and injured 76 others. *Id.* at 583. The court also found probable cause to believe that Abu Marzook knew of these terrorist attacks and that he selected the leadership and supplied the money to enable the attacks to take place. *Id.* at 585–592.

That HAMAS engaged in such attacks is further supported by Israel's deportation of 415 HAMAS operatives in Israel and the Occupied Territories on December 17, 1992. The Israeli government publicly stated that this mass deportation was undertaken in response to the murders of several members of Israeli military and police units in the previous weeks, murders for which HAMAS publicly claimed credit. Among these attacks was the murder of an Israeli soldier by the Hebron military cell of HAMAS, a cell that alleg-

edly was supported with weapons and money provided by Al–Arouri with funds he received from Salah in September 1992. The last of these attacks occurred on December 15, 1992 when the stabbed and mutilated body of a kidnaped Israeli border police officer in the West Bank was dumped on the main road between Jerusalem and Jericho. The discovery of the body was the catalyst for Israel's arrest and detention of approximately 1200 Palestinians, which was followed on December 17, 1992 with the mass deportation of over 400 suspected HAMAS members.

The government argues that this alleged campaign of violence raises a reasonable inference that the foreign funds transferred into the Salahs' accounts were intended to promote similar activities against Israel and its citizens. The Salahs counter that the murders outlined above are of no help to the government because at the time "specified unlawful activity" included only "kidnaping, robbery, or extortion." The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, amended this provision to read "murder, kidnaping, robbery, extortion, or destruction of property by means of explosive or fire." 18 U.S.C. § 1956(c)(7)(B)(ii). That murder was not listed as specified unlawful activity until 1996 does not mean that it irrelevant to this action. Murder undertaken as an extortionate measure would constitute extortion even under the old definition of "specified unlawful activity." See 18 U.S.C. § 1951(b). The murders outlined above fall within this category because HAMAS allegedly committed them in an attempt to force Israel to cede control over the lands comprising Israel and the Occupied Territories of the West Bank and Gaza Strip.

The Salahs further claim that the activities outlined in the complaint cannot serve as predicates for a violation of the money laundering statute because extortion and kidnaping against Israel are not crimes under Israeli law. The Salahs claim that the money laundering statute, by defining "specified unlawful activity," in part, as "an offense against a foreign nation involv-

ing ... murder, kidnaping, robbery, extortion, or destruction of property by means of explosive or fire," requires that the law of the foreign nation regard the acts of extortion and kidnaping against the state as crimes. The Salahs conclude that, because Israeli law nowhere defines extortion or kidnaping against the state as a crime, the government cannot establish that the funds were transferred with the intent to promote the carrying on of specified unlawful activity. The Salahs submit the affidavit of Avigdor Feldman, an attorney licensed to practice law in Israel, in support of this argument. He avers that the Emergency Defense Regulations and the Prevention of Terrorism Ordinance, which define crimes of terror against the state, do not contain crimes of extortion or kidnaping.

We disagree. The Salahs interpret the phrase "against a foreign nation" as requiring that the offense be committed against a public official or government entity. This is an overly restrictive interpretation and would unduly limit the ability of the federal government to prosecute those who launder money for the purpose of promoting serious criminal activity in a foreign country. Given its ordinary meaning, the phrase "against a foreign nation" merely requires that the conduct be prohibited under the law of the foreign nation in which it is committed. This is similar to a federal narcotics offense in this country that, although may not directly involve a public official or government agency, is considered an offense against the United States. The Salahs' argument fails because kidnaping and extortion are crimes under Israeli law. In his affidavit, Mr. Feldman states that abduction, i.e. kidnaping, and extortion are crimes under Israeli law and has attached to his affidavit the relevant laws to prove it. This is enough to bring the alleged extortion and kidnaping against Israel and its citizens within the statute.

In conclusion, we find that the campaign of violence HAMAS allegedly undertook in

the fall of 1992, which involved murders, kidnapings, and extortion under the direction of Abu Marzook, raises a reasonable inference that the defendant funds were transferred into the Salahs' accounts with the intent to promote and finance extortionate activities against Israel and its citizens. This inference is especially appropriate in light of the manner in which these funds were transferred into the United States and Salah's alleged admissions that he was coordinating and supporting terrorist attacks against Israel with HAMAS military operatives to whom he was also distributing funds.

## II. The Complaint Alleges a Reasonable Basis for Believing that QLI's Assets are Tainted.

 QLI has filed claims to the funds in First National Bank of Chicago account no. 12310153; Midland Federal Savings and Loan account no. 0010930021133; First National Bank of Evergreen Park account no. 1412446; and one 1997 E35 Ford Van. These assets are traceable to a business transaction involving the purchase, lease, and sale of real property in Woodridge, Illinois. The genesis of this transaction was a series of meetings beginning in March 1991 between Tamer Al–Rafai, President of Golden Marble Corporation, and QLI President Ahmad Zaki Hameed, who represented himself as a possible investor in a land development project Al–Rafai hoped to start. The result of these meetings was that Hameed instructed Al–Rafai to bid on the land for the project and, if the bid was accepted, QLI would arrange to finance the project. Two months later, Al–Rafai made a successful bid of $820,000 for a large unimproved lot located in Woodridge, Illinois. Hameed then informed Al–Rafai that he had located a source of financing in Saudi Arabia and that QLI would handle all matters regarding the investment and the investor.

On July 19, 1991, Saudi Arabian businessman Yassin Kadi, allegedly acting pursuant to instructions from Hameed, wire transferred $820,000 to Golden Marble from a Swiss bank. Kadi financed the Woodridge land deal without requiring security. Security was provided over five months later on December 31, 1993 when a $820,000 mortgage lien was executed in favor of Gamal Ahmed, Kadi's business representative in the United States. The mortgage, however, was never recorded as a lien against the Woodridge property and Ahmed has denied any association with or knowledge of QLI. On July 22, 1991, Golden Marble purchased the Woodridge property. The following day, Hameed and QLI Secretary and Trustee Amer Haleem brought Al–Rafai to the Midland Federal Bank. There, Al–Rafai executed a document transferring the Woodridge property to Midland Land Trust No. 1206–0, which Hameed created in his capacity as QLI's president four days before the land deal closed. The trust documents specify the Woodridge land as the only asset of the trust and QLI as the sole trust beneficiary and do not refer to Al–Rafai, Golden Marble, or Kadi.

After the land was transferred to the trust, QLI leased the land back to Al–Rafai pursuant to a lease and sale agreement signed by Hameed for QLI and Al–Rafai for Golden Marble. The agreement provided that Golden Marble would lease the property from July 22, 1991 through July 21, 1993 for $164,000 from QLI, the owner of the property. The agreement specified that Golden Marble was to pay rent in a lump sum of $150,000 on July 22, 1991, with the remaining $14,000 due three months later. The agreement provided that Golden Marble was to purchase the property within two years, i.e. July 1993, for $970,000. In September 1991, Al–Rafai, on behalf of Golden Marble, wrote two rent checks to QLI totaling $110,000, with Al–Rafai paying to QLI the $40,000 balance of the rent on November 27, 1992. On June 30, 1994, QLI sold the Woodridge property for $1,050,000 and deposited $988,500, the net proceeds of the sale, into the First National Bank of Chicago account no. 12310153. This account is a simple interest bearing checking account

with a current balance of $876,300.54 through which QLI has only intermittently transacted business.

The government claims that the Woodridge land deal was undertaken and structured so that QLI could channel the proceeds to Salah to advance HAMAS' alleged campaign of violence against Israel. The nature of the relationship between Salah and QLI thus becomes crucial to this theory. This relationship began as early as January 1991 and continued through January 1993 when Salah traveled to Israel at the request of HAMAS leader Abu Marzook. As detailed above, the government alleges that Salah was involved in numerous activities on behalf of HAMAS during this period. While Salah was allegedly participating in and promoting HAMAS' terrorist activities, QLI was representing that Salah had been one of its full-time employees since January 1, 1991. Based in part on these representations, Salah was able to obtain from the Standard Bank & Trust Company of Evergreen Park, Illinois a mortgage loan in excess of $100,000 for his residence in Bridgeview, Illinois. These representations also enabled Salah to open an account with the First National Bank of Chicago, an account into which the government alleges $107,000 was deposited to promote HAMAS' terrorist activities.

Salah also received direct financial support from QLI principals. For example, on June 18, 1991, Salah received $40,500 from Linda Abusharif, the sister of QLI Treasurer Abraham Abusharif. Also, in October 1991, QLI President Hameed transferred to Salah three checks totaling $18,000 drawn from his personal account. Further, on January 13, 1993, Salah wrote a $3,000 check to Amer Haleem, the Secretary of QLI. QLI claims that these transfers say nothing about the relationship between QLI and Salah because the QLI principals were acting in their individual capacities, not that of QLI. QLI cites *United States v. 7326 Highway 45 North*, 965 F.2d 311 (7th Cir.1992), in which the Seventh Circuit reversed the district court's granting of summary judgment for the government forfeiting the property of a corporation owned by a married couple and their adult son. There, the son, unbeknownst to his parents, used the property to distribute drugs. The Court held that the property was not subject to forfeiture because under the circumstances the son's activities could not be imputed to the corporation.

The *7326 Highway* decision does not prevent the government from forfeiting QLI's property. The Seventh Circuit decided *7326 Highway* on a motion for summary judgment, and with good reason, because a factual record was needed to determine whether the son was acting at least in part for the benefit of the corporation. The same result follows here. It is impossible for this court to conclude based solely on the allegations of the complaint that the QLI principals were acting outside the scope of their employment when they assisted Salah. QLI principals assisted Salah over a period of at least two years, beginning with the false representations that QLI made to the banks regarding Salah's employment status. And unlike the situation in *7326 Highway*, this assistance did not come from just one person at QLI but involved a number of different people at different levels in the corporate structure. Based on these allegations, it is reasonable to infer that QLI, through the small group of persons that controlled its operations, provided substantial assistance to Salah during the same period that Salah allegedly was a HAMAS operative.

The complaint also raises an inference that the proceeds of the Woodridge land deal were intended to support Salah's HAMAS-related activities. Although QLI, through its President Hameed, played a significant role in developing and financing the land deal, there is little question it was structured so as to disguise any connection to QLI. For example, the funds used to purchase the Woodridge land took a curious route. These funds were transferred from Saudi Arabian businessman Yassin Kadi to the United States. But rather

than transfer these funds to QLI—the true owner of the property and the architect of the land deal—Kadi sent them to Tamer Al–Rafai and Golden Marble Corporation without obtaining any security. Golden Marble and Kadi closed the deal so that Golden Marble, not QLI, was the apparent purchaser. At the request of Hameed, Al–Rafai and Golden Marble then transferred title to the Woodridge property to a trust that Hameed had created four days before the Woodridge land deal closed. The Woodridge property was the only asset of the trust and QLI was the sole trust beneficiary of the trust.

QLI then leased the Woodridge property back to Golden Marble and Al–Rafai. In September 1991, Al–Rafai made lease payments by tendering to QLI two checks totaling $110,000. These checks were not deposited until March 11, 1992, when Amer Hameed endorsed the checks over to a third party. Within days, Faisal Financial transferred $27,000 to Salah's First National Bank account. Faisal Financial followed this transfer with $30,000 on July 7, 1993, just weeks before Salah's August 1992 trip to Israel on HAMAS business, and $50,000 on October 7, 1992, shortly after Salah returned from Israel. These three transfers totaled $107,000, an amount nearly equal to the $110,000 QLI received in rent from Al–Rafai (the difference perhaps attributable to transactions fees). We find that the timing of these transfers and their amounts raise a reasonable inference that the rent proceeds were transferred to Faisal Financial in Geneva, Switzerland and then to Salah's First National Bank account, an account that Salah opened with the assistance of QLI Treasurer Abusharif when the Woodridge land deal closed.

There are still other facts that suggest QLI intended the proceeds of the Woodridge land deal to support Salah's HAMAS-related endeavors. The lease agreement provided that Al–Rafai would lease the Woodridge property through July 1993, at which time Al–Rafai could purchase the property. Notwithstanding this provision, beginning in mid-December 1992, Hameed repeatedly called Al–Rafai and pressured him to purchase the Woodridge property. The government alleges that, according to Al–Rafai, Hameed repeatedly told Al–Rafai that the money tied up in the property was needed immediately for "a mission above all else." During this same period, Amer Haleem also contacted Al–Rafai and told Al–Rafai to do whatever was necessary to liquidate the Woodridge property and get the money to QLI. Al–Rafai was unable to liquidate the property because Golden Marble lacked the resources to do so. These conversations took place immediately after Israel's summary deportation of 415 HAMAS operatives which, in turn, prompted Salah's January 1993 trip to Israel.

These facts, taken as whole, raise the inference that the funds used to finance the Woodridge land deal were transferred from outside the United States with the intent that they be used to promote HAMAS' alleged campaign of violence against Israel and its citizens. The circumstances surrounding the Woodridge land deal, the relationship between QLI and Salah, and the efforts of QLI to provide financial support to Salah all raise the inference that QLI ordered Kadi to transmit the money used to purchase the Woodridge land with the intent that it would be used to support Salah in his activities on behalf of HAMAS. QLI objects to this conclusion arguing that its intent is irrelevant to whether this transfer violates the money laundering statute because the "statutory terms 'transports, transmits, or transfers' focus the inquiry on the action and intent of the sender, not the recipient." (Mem. Supp.Mot. Dismiss at 12). QLI concludes that, because the complaint says little about Kadi or his intent, the complaint does allege that the funds used to purchase the Woodridge land were transferred with the intent to promote the carrying on of specified unlawful activity.

There is nothing in the statute or the legislative history indicating that Congress intended the verbs "transports, transmits,

or transfers" in Section 1956(a)(2) to apply only to the transferor of the funds. Elsewhere in the statute, Congress provided that an individual who "conducts or attempts to conduct" certain financial transactions with tainted assets engages in money laundering. 18 U.S.C. § 1956(a)(1). These terms, which are stated in the same active form as "transports, transmits, and transfers," have been interpreted to reach anyone who initiates or concludes the transaction. *United States v. Li*, 55 F.3d 325, 330 (7th Cir.1995); *see also United States v. Baez*, 87 F.3d 805, 810 (6th Cir.) (defendant laundered money when he sent third party to pick up and deliver drug proceeds to another state), *cert. denied*, 519 U.S. 973, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996). That Section 1956(a)(2) is not limited to the transferor of the funds is further evidenced by Section 1956(b) which provides that a person violates Section 1956(a)(2) if he "conducts or attempts to conduct" such a transaction. We therefore reject QLI's contention that the complaint fails to allege a violation of Section 1956(a)(2) because it says nothing about Kadi or his intent.

We also find that the complaint alleges that the funds derived from the Woodridge land deal were subsequently deposited in QLI's bank accounts. On July 9, 1993, a certified check debited from Golden Marble's account no. 60609146 at the Midland Federal Savings & Loan Association was drawn and made payable to QLI in the amount of $169,000. The government alleges that, according to Al–Rafai, this check was payment for a one year lease extension on the Woodridge property negotiated between QLI and Golden Marble. On September 24, 1993, this check was deposited into QLI's Midland Federal Savings & Loan account no. 0010930021133. After the Woodridge property was sold on June 30, 1994, the net proceeds from the sale were deposited into QLI's First National Bank of Chicago General Fund account no. 12310153. The Ford Van the government seeks to forfeit was purchased from funds in this account in October 1996. Also, shortly after Salah returned to Chi-

cago after serving his sentence in Israel, QLI transferred $50,000 from the General Fund account into First National Bank of Evergreen Park account no. 1412446, held in the name of QLI.

In conclusion, we find that the government has alleged a reasonable basis for its belief that QLI arranged for Kadi to transfer the funds to purchase the Woodridge land from abroad with the intent that they would be used to promote the carrying on of specified unlawful activity. QLI raises a series of questions it claims refutes the inference that these funds were intended to be transferred to Salah: (1) Why, if QLI was so driven to obtain cash for Salah, did it not sell the property in June 1993 instead of waiting until June 30, 1994?; (2) If the idea was to have money readily available for HAMAS, why didn't QLI choose an investment vehicle more liquid than real estate?; and (3) How can anything sinister be inferred from putting the Woodridge property in a secret land trust when a subpoena in an ordinary civil action would disclose records leading back to QLI? While these are interesting questions that QLI may raise at trial, the government has alleged a sufficient nexus between the funds contained in the subject bank accounts, and the Ford Van purchased with those funds, with a violation of the money laundering statute.

### III. Discovery is Needed to Determine Whether This Action is Timely under 18 U.S.C. § 984.

The Salahs argue that this action is untimely under the one year period of limitations found in 18 U.S.C. § 984. That section applies to in rem forfeiture cases involving fungible property, like money, that is often difficult to trace to the underlying offense. This provision, however, does not apply in this case because the government has traced the funds from the time they were transferred into the United States in violation of the money laundering statute. This case is therefore subject to the limitations period set forth in 19

U.S.C. § 1621 which requires a forfeiture action to be "commenced within five years after the time when the alleged offense was discovered." This period runs not from the date of the underlying specified unlawful activity but from the date that the United States knew or reasonably should have known of the offenses. *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Cir.1998). What the government knew and when it knew it is an issue for discovery that cannot be answered on the face of the complaint.

### IV. Discovery is Needed to Determine Whether the Innocent Owner Defense Applies.

Mrs. Salah moves to dismiss the complaint on the grounds that she and her children are innocent owners under 18 U.S.C. § 981(a)(2) which provides that "[n]o property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder." 18 U.S.C. § 981(a)(2). Mrs. Salah claims that she is an innocent owner because she lacked knowledge of the illegal activity that the government alleges in the complaint. She also argues that her minor children are innocent owners because they are too young to have knowledge of the illegal activity as a matter of law.

■ Because the "so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant," *United States v. 755 Forest Road*, 985 F.2d 70, 72 (2d Cir.1993) (applying the analogous provision of 21 U.S.C. § 881), determining whether a claimant is an innocent owner is ordinarily not susceptible to a motion to dismiss. This case is no exception. The complaint alleges that Mrs. Salah, at the request of Salah while he was in Israel in January 1993 on HAMAS business, wire transferred $200,000 from their LaSalle Bank account to a First Chicago Bank account held in the name of Rihbe Abdel Rahman. (Aff.¶ 50). Rahman then transferred the $200,000 to Salah in the Middle

East. (*Id.*). The government also alleges that shortly after Salah was arrested Mrs. Salah withdrew $723,541.18 from the bank accounts and converted it to her personal use. These facts cast doubt on Mrs. Salahs' claim that she was unaware of the criminal activity her husband allegedly undertook on behalf of HAMAS. Therefore, we cannot conclude at this stage of the litigation that Mrs. Salah is an innocent owner within the meaning of Section 981(a)(2).

■ We likewise find that a factual record is needed to determine whether the Salahs' minor children are innocent owners. Because the complaint does not allege the age of these children this court cannot conclude that they are incapable of having the knowledge necessary to support the forfeiture of those funds. More importantly, even if the children are too young to have the requisite knowledge, a factual record is needed to determine whether the Salahs' minor children have a sufficient interest in the funds to challenge the forfeiture. Although the Salah children hold title to the funds in Standard & Trust account no. 56002850 jointly with their mother, possession of legal title by one who does not exercise dominion and control over the property may be insufficient to establish standing to challenge the forfeiture. *United States v. 2030 E. Monroe Street*, 884 F.Supp. 1218, 1222–23 (C.D.Ill. 1995) (collecting cases). This rule is "based on the candid determination that things are often not what they appear to be especially in the world of ... illegal operations." *United States v. One 1977 36 Foot Cigarette Ocean Racer*, 624 F.Supp. 290, 294–95 (S.D.Fla.1985).

We find that discovery is needed to determine whether the Salah children are merely nominal owners through whom Mrs. Salah is attempting to shield the funds in Standard & Trust account no. 56002850 from forfeiture. The timing of the transfer as pled in the complaint alone raises a skeptical brow. If this is the course the government chooses to take, it

will have the initial burden of establishing probable cause to believe that the Salah children are nominal owners of the funds. *2030 E. Monroe Street,* 884 F.Supp. at 1222–23 (C.D.Ill.1995). Once the government makes this showing, the burden will then shift to the Salah children to present evidence of dominion and control or some other indicia of true ownership beyond the mere fact that they hold legal title to the funds. *Id.* For these reasons, we deny the motions to dismiss the complaint on the basis of the innocent owner defense without prejudice to the claimants renewing this argument in a motion for summary judgment.

## V. The Government Has Not Violated the Salahs' Procedural Due Process Rights.

■ The Salahs next argue that the ex parte seizure of the defendant property violates their procedural due process rights. As to their residence, the Salahs rely on *United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), in which the Supreme Court held that absent exigent circumstances the government cannot seize real property in a civil forfeiture proceeding without providing the owner pre-seizure notice and a meaningful opportunity to be heard. The Salahs' residence, however, was not seized. The warrant for arrest in rem issued for the home merely enabled the government to file a lis pendens notice against the property, a procedure that the Court in *Daniel Good* endorsed. *Id.* at 58, 114 S.Ct. 492. As a result, the Salahs continue to live in the residence and thus far have been permitted to keep all proceeds from the rental unit in the residence. This procedure easily withstands scrutiny under the due process clause.

[17] With respect to the defendant funds, they are personal property to which the procedural protections outlined in *Daniel Good* do not apply. *United States v. Lot 41,* 128 F.3d 1386, 1392 (10th Cir. 1997). Recognizing this, the Salahs claim that the funds are akin to real property

because the U.S. Treasury Department already froze these funds preventing their transfer. We reject this argument because the ex parte seizure was necessary to prevent Mrs. Salah from withdrawing a portion of these funds each month under the license issued pursuant to the freeze order. Also, that these funds were frozen pursuant to an order that the Salahs do not challenge militates against finding a due process violation because the Salahs did not have the right to possess, use, or transfer these funds. Because this freeze order virtually destroyed the rights incident to ownership, the minimal interests affected by the seizure weighs heavily against the balance articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). For these reasons, the ex parte seizure of the funds did not violate the Salahs' due process rights.

## VI. The Attempted Forfeitures Do Not Violate the Excessive Fines Clause of the Eight Amendment.

■ Mrs. Salah claims that the forfeiture of the defendant property violates the Excessive Fines Clause of the Eight Amendment. She cites *United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), but does not explain how that decision renders the attempted forfeitures in this case excessive. The *Bajakajian* case dealt with an in personam forfeiture under § 982(a)(1) which, as the Court took great pains to note, is different than an in rem forfeiture action brought against the "instrumentality" of the offense. *Id.* at 2035–36, 118 S.Ct. 2028. This case falls within the latter category because the government seeks to forfeit property that served as "the actual means by which an offense was committed" and no more. *Id.* at 2036 n. 8, 118 S.Ct. 2028. The complaint here also alleges harm that goes far beyond the "minimal" harm that the defendant in *Bajakajian* caused the government. *Id.* at 2039, 118 S.Ct. 2028. In short, there is nothing in the compliant to suggest that the attempted forfeitures in this case are "grossly

809

disproportional to the gravity" of the contributions that the Salahs allegedly made to the HAMAS campaign of violence against Israel and its citizens. *Id.* at 2036, 118 S.Ct. 2028.

### CONCLUSION

For the foregoing reasons, we find that the complaint establishes a reasonable basis for the government's belief that the funds are forfeitable because they were transferred in violation of Section 1956(a)(2)(A). The motions to dismiss are granted to the extent the complaint seeks to forfeit the residence and Ford Van because they were involved in a financial transaction in violation of Section 1957. The complaint, however, establishes a reasonable basis for the government's belief that the Ford Van and residence are forfeitable because they were derived from the tainted funds. Accordingly, the motions are granted in part and denied in part. The next status hearing in this case is scheduled for May 18, 1999 at 9:00 a.m. It is so ordered.